**William HAYDEN, et al., Plaintiffs–Appellants,**

**v.**

**COUNTY OF NASSAU, et al., Defendants–Appellees,**

**United States of America and Nassau County Guardians Association, Defendants–Intervenors–Appellees.**

**Docket No. 98–6113.**

United States Court of Appeals, Second Circuit.

Argued March 12, 1999.

Decided June 9, 1999.

Martin S. Kaufman, Atlantic Legal Foundation, Inc., New York, N.Y., for Plaintiffs–Appellants.

Charles D. Cunningham, Snitow & Cunningham, LLP, New York, N.Y. (William H. Pauley, III, on the brief), for Defendants–Appellees.

Linda F. Thome, United States Department of Justice, Washington, D.C.(Dennis J. Dimsey, on the brief), for Intervenor–Defendant–Appellee United States of America.

Robin L. Alperstein, Cravath, Swaine & Moore, New York, N.Y. (Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.,

Paul C. Saunders, Cravath, Swaine & Moore, New York, N.Y., on the brief), for Intervenor–Defendant–Appellee Nassau County Guardians Association.

Before: OAKES, WALKER and KEITH [*], Circuit Judges.

KEITH, Circuit Judge:

William Hayden and 67 other white, Latino and female applicants to the Nassau County Police Department challenge a district court order which dismissed their class action suit pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c). The district court found that the police department's entrance examination, although designed with race in mind (i.e., to minimize the discriminatory impact on minority candidates), was administered and scored in a race-neutral fashion. As such, the court concluded that appellants failed to state a claim entitling them to relief under the Equal Protection Clause and various sections of Title VII and the Civil Rights Act of 1991. Appellants dispute this ruling, and urge that the entrance examination necessarily discriminates against them. For the reasons set forth below, we affirm the district court's dismissal of the class action suit.

## I. BACKGROUND

### A. Factual Background

In 1977, the U.S. Department of Justice ("DoJ") sued the County of Nassau, the Nassau County Civil Service Commission, and the Nassau County Police Department (collectively referred to as "Nassau County" or the "County") for discriminating against black, Latino and female applicants in the hiring of its police department. The case was settled in 1982 by entry of a consent decree, in which Nassau County expressly denied that it discriminated against blacks, Latinos or females. The County did, however, acknowledge that certain of its selection criteria and personnel practices, and the substantial underrepresentation of these groups in the Nassau County Police Department might support an inference that discrimination had occurred.

To that end, the 1982 consent decree prohibited the County from engaging in any further discrimination. Nassau County was also ordered to utilize entrance exams which either had no discriminatory impact on minority applicants or had been "validated" [1] in accordance with Title VII and the Uniform Guidelines on Employee Selection Procedures (the "Uniform Guidelines").[2]

In 1983 and again in 1987, Nassau County administered entrance exams which had severe adverse impacts on black, Latino and female applicants. The DoJ challenged the results of both tests. Those challenges culminated in two additional consent decrees (collectively referred to as the "1990 consent orders"). In the 1990 consent orders, the DoJ and Nassau County agreed to work together to develop an examination which would eliminate, or at least significantly reduce, the discriminatory impact on minority and female candidates. As a result, the "Technical Design and Advisory Committee" ("TDAC") was formed, with experts appointed by both the DoJ and Nassau County.

After years of work, the TDAC developed the 1994 Nassau County police officers' examination, which was administered to over 25,000 applicants in July and October of 1994. Appellants are 68 white and Latino applicants, male and female, who sat for the 1994 exam.

After the exam was given to the applicants, the TDAC conducted an analysis of

---

[*] The Honorable Damon J. Keith, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. *See infra* note 3.

2. The Uniform Guidelines, issued pursuant to 28 C.F.R. § 50.14 and 29 C.F.R. 1607, have been adopted by the EEOC, the Civil Service Commission, and the Departments of Justice and Treasury.

whether the exam was "valid" [3] and whether the exam had any adverse impact on minority applicants.[4] As part of its validity analysis, the TDAC considered several different configurations, or test batteries, of the twenty-five sections which had been administered to the applicants. TDAC's goal was to find a test battery which was sufficiently valid, yet minimized the adverse impact on minority applicants. Of the twenty-five sections administered to the applicants, the TDAC Report recommended that Nassau County use nine sections as the 1994 test. Notably, there was another configuration of the exam which best minimized the adverse impact on minority applicants. That battery, however, was not endorsed because it had a lower validity (i.e., job relatedness) than all of the other configurations.

The DoJ and Nassau County independently reviewed the TDAC Report, and jointly requested that the district court approve Nassau County's use of the TDAC-recommended configuration. The district court granted their request, authorizing the use of the 1994 exam.

### B. Procedural Background

Appellants initiated a class action suit against Nassau County in April 1997, challenging the use of the 1994 exam. Appellants brought their action pursuant to the Fourteenth Amendment to the U.S. Constitution, Title VII of the Civil Rights Law of 1964, the New York State Constitution, and several New York state statutes.

The United States and the Nassau County Guardians Association (the "Guardians"), an association of black police officers, were permitted to intervene in the suit as defendants. In December of 1997, the Nassau County defendants and the United States filed a joint motion for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In that same month, the Guardians moved for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

On March 20, 1998, the district court entered a Memorandum of Decision and Order dismissing all of appellants' claims for failure to state a claim upon which relief may be granted.

Appellants filed a timely notice of appeal on April 24, 1998.

### II. ANALYSIS

An appellate court reviews *de novo* a district court's dismissal of a complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). *See Still v. De-Buono*, 101 F.3d 888, 891 (2d Cir.1996). In reviewing the district court's dismissal, the appellate court must accept as true all allegations contained in the complaint and must resolve all inferences in favor of the non-moving party. *See id.* The complaint should be dismissed only if there is no doubt that the plaintiff is unable to prove a set of facts which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Still*, 101 F.3d at 891.

Appellants contend that by deliberately designing an entrance exam which would minimize the adverse impact on black candidates, Nassau County necessarily discriminated against appellants. On that basis, appellants argue that they have sufficiently stated claims for relief under the Equal Protection Clause of the U.S. Constitution, Title VII, and §§ 106 and 107 of the Civil Rights Act of 1991. We, however, conclude that there is no doubt that appellants have failed to allege facts

---

**3.** A "valid" exam is one which sufficiently measures a candidate's on the job performance. Stating that an exam is "valid" denotes an entirely different concept from stating that an exam has been "validated." A "validated" exam conforms with Title VII and the Uniform Guidelines.

**4.** The results of this analysis were chronicled in a report prepared by the TDAC (the "TDAC Report").

which, if proven true, would entitle them to relief. We discuss each claim in turn.

## A. Equal Protection

■ To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender. Such intentional discrimination can be demonstrated in several ways. First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227–29, 115 S.Ct. 2097, 2105, 2112–14, 132 L.Ed.2d 158 (1995). In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. See Yick Wo v. Hopkins, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886). Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect. See Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

### 1. Absence of Facial Classification

■ The sole allegation set forth in appellants' complaint as to their Equal Protection claim is that "[b]y designing, administering and scoring the Exam in a race-conscious way, with the intent of solely or primarily benefitting one racial group to the detriment of other racial or ethnic groups, Defendants have violated ... the equal protection of the law guaranteed by the Fourteenth Amendment...." In the briefs submitted to this Court, appellants further argue that this allegation should be construed as a facial classification which expressly distinguishes between applicants on the basis of race. Appellants reason that since Nassau County designed the 1994 exam with racial factors in mind (i.e., with the intent to diminish the adverse effects suffered by minority applicants),

Nassau County has expressly treated applicants differently because of their race. Accordingly, they argue a strict scrutiny standard of review should be applied.

■ We find this argument wholly without merit. A statute or policy utilizes a "racial classification" when, on its face, it explicitly distinguishes between people on the basis of some protected category. See, e.g., Loving v. Virginia, 388 U.S. 1, 11–12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (invalidating a miscegenation statute which, on its face, prohibited interracial marriages); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 282–84, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986) (invalidating a school board plan which expressly utilized race-based preferences in teacher lay-offs); Adarand, 515 U.S. at 227, 115 S.Ct. at 2112–13 (concluding that a federal set-aside program which, on its face, provided financial incentives to hire minority subcontractors would be subject to strict scrutiny).

The district court concluded, and appropriately so, that appellants' allegations do not support a claim that the 1994 exam was discriminatory on its face. Nassau County's entrance exam did not differentiate between applicants on the basis of race or gender. It is undisputed that the exam was administered and scored in an identical fashion for all applicants. The exam was not scored differently on the basis of a candidate's ethnicity or gender, nor were differential cut-off points used for applicants of different races or sexes.

In fact, the only manner in which race was implicated is that Nassau County set out to design an entrance exam which would diminish the adverse impact on black applicants. This desire, in and of itself, however, does not constitute a "racial classification." Since the exam was administered in a race-neutral fashion which did not expressly distinguish between applicants on the basis of race, Nassau County's intent, without anything more, does not implicate an express, racial classification. Rather,

the plaintiffs are mistaken in treating 'racial motive' as a synonym for a constitutional violation. Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race. That does not make such enactments or actions unlawful or automatically 'suspect' under the Equal Protection Clause.... The term [racial classification] normally refers to a governmental standard, preferentially favorable to one race or another, for the distribution of benefits.

*Raso v. Lago*, 135 F.3d 11, 16 (1st Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998); *see also Hornell Brewing Co. v. Brady*, 819 F.Supp. 1227, 1241 n. 11 (E.D.N.Y.1993) ("[E]qual protection proscribes race based *classifications*, not all statutes whose purpose it is to protect certain racial or ethnic groups.... The statute [prohibiting the use of the name "Crazy Horse" on any alcoholic product] was enacted on behalf of protecting a specific ethnic group [Native Americans]; however, it requires no differential treatment on the basis of race.") (emphasis added).

Because appellants misconstrue the County's race-conscious efforts to redesign its entrance exam as a "racial classification," appellants unpersuasively cite to numerous "reverse discrimination" cases. In particular, appellants heavily rely on widely known affirmative action cases such as *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Adarand.* We find these cases distinguishable from the case at bar. Our reading of those cases suggests that they are concerned with *select* affirmative action tools, such as quota systems, set-aside programs, and differential scoring cutoffs, which utilize express racial classifications and which prevent non-minorities from competing for specific slots or contracts.

For example, in *Bakke*, the Supreme Court invalidated a medical school admissions program where 16 slots out of 100 were reserved for minority and disadvantaged applicants. The Court rejected the use of this quota system because nonminority candidates were prevented from competing for a specific percentage of seats in the incoming class. *See Bakke*, 438 U.S. at 319–20, 98 S.Ct. at 2763. Likewise, in its decision in *Croson*, the Court rejected a local set-aside program which required prime contractors awarded city construction contracts to subcontract at least 30% of the contract with minority businesses. *See Croson*, 488 U.S. at 477, 511, 109 S.Ct. at 713, 731. Regardless of the "benign" intent behind such minority set-aside programs, the Court clarified that the use of an express racial classification, whether benign or invidious, would be subject to strict scrutiny. *See id.* at 493–94, 109 S.Ct. at 721–22. The Court reasoned that this result was warranted even for benign racial classifications because the set-aside program "denie[d] certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race." *Id.* at 493, 109 S.Ct. at 721; *see also Adarand*, 515 U.S. at 227–36, 115 S.Ct. at 2112–17 (holding that facial racial classifications imposed by the federal government should also be subject to strict scrutiny review).

Cases such as *Bakke, Croson* and *Adarand* are plainly distinguishable from the matter currently before us. A touchstone of equal protection is that the government may not subject persons to unequal treatment based on race. *See Adarand*, 515 U.S. at 224, 115 S.Ct. at 2111 (holding that strict scrutiny applies to "any racial classification subjecting [a] person to unequal treatment"). Here, unlike in the above cited cases, although Nassau County was necessarily conscious of race in redesigning its entrance exam, it treated all persons equally in the administration of the exam. *Cf. Allen v. Alabama State Bd. of Educ.*, 164 F.3d 1347, 1353 (11th Cir.1999)

(affirming consent decree requiring that school board develop an exam that minimizes racially disparate impact, and stating that "nothing in *Adarand* requires the application of strict scrutiny to this sort of race-consciousness"). As such, Nassau County's desire to design an exam which would lessen the discriminatory impact on black applicants is simply not analogous to a quota system or a minority set-aside where candidates, on the basis of their race, are not treated uniformly. Accordingly, appellants have failed to demonstrate that the 1994 exam represented an improper racial classification.

### 2. *Absence of Facially Neutral Policy Applied in Discriminatory Manner*

Clearly, appellants' allegations fail to set forth a claim that the 1994 exam was a facially neutral test applied in a discriminatory manner. The police officers' examination was administered and scored in the same manner for all applicants. *Cf. Yick Wo,* 118 U.S. at 373–74, 6 S.Ct. at 1072–73 (finding an equal protection violation where a facially neutral ordinance was discriminatorily applied to Chinese businesses).

### 3. *Absence of Discriminatory Intent and Effect*

As appellants fail to establish an equal protection violation under the first two theories, we agree with the district court's conclusion that in order to survive Rules 12(b)(6) and 12(c), appellants must sufficiently allege that the Nassau County defendants harbored a discriminatory intent against them and that the entrance examination disproportionately impacted them. We find that appellants fail to put forth any claims which would demonstrate either discriminatory intent or discriminatory impact.

#### a. *Discriminatory Intent*

Appellants' brief contends that, by designing the entrance exam so as to lessen the adverse impact on minority applicants, Nassau County intended to treat candidates differently on the basis of their race or ethnicity. This, they charge, amounts to intentional discrimination. Appellants further allege that this is a very subtle and insidious type of discrimination because it was done to "avoid the weaknesses of candidates belonging to favored racial or ethnic groups." (Appellants' Br. at 17).

We determine that appellants' claims do not sufficiently allege that Nassau County harbored an intent to discriminate against them. Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse effects* upon an identifiable group." *Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (emphasis added). Discriminatory intent or purpose typically refers to those instances when a government actor seeks to disadvantage or negatively impact a group of persons. *See, e.g., Washington v. Davis,* 426 U.S. 229, 245–46, 96 S.Ct. 2040, 2050–51, 48 L.Ed.2d 597 (1976) (concluding that purposeful discrimination was not present in a police officers' examination designed simply to test the level of an applicant's verbal skills even though black candidates suffered disproportionate adverse effects); *Arlington Heights,* 429 U.S. at 268–71, 97 S.Ct. at 565–66 (finding that, although the ultimate effect of a policy was discriminatory, there was no intent to discriminate when the record aptly demonstrated the decision was motivated by zoning, not racial, concerns); *Adarand,* 515 U.S. at 230, 115 S.Ct. at 2114 (an "individual suffers an injury when he or she is *disadvantaged* by the government because of his or her race ....") (emphasis added).

Despite appellants' inflammatory suggestion that the exam was designed to avoid the weaknesses of a favored racial group, their sole allegation, at its simplest, is that designing the police officers' entrance exam to mitigate the negative im-

pact on minority candidates (thereby improving their chances for selection) is akin to an intent to discriminate against appellants. This allegation is wholly insufficient to state a claim that the County intended to discriminate against appellants because it does not demonstrate that the County designed the 1994 exam "because of" some desire to adversely affect appellants. *See Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. Nothing suggests that the County sought to disadvantage appellants, or that the County was propelled by sinister or invidious motivations. A desire to reduce the adverse impact on black applicants and rectify hiring practices which the County admitted in the 1982 consent order might support an inference of discrimination is not analogous to an intent to discriminate against non-minority candidates. As the district court so aptly phrased it: "where an exam that discriminates against a group or groups of persons is reviewed, studied and changed in order to eliminate, or at the very least, alleviate such discrimination, there is a complete absence of intentional discrimination."

Appellants' position would have us equate the County's desire to eliminate the discriminatory impact of its hiring practices on minority applicants with an intent to discriminate against Appellants. To so find could seriously stifle attempts to remedy discrimination. If employers or governmental entities fear that they will be charged with discriminating against non-minorities, they will shy away from all proper efforts to rectify prior discrimination. ██ "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it [within, of course, constitutional parameters]." *Adarand,* 515 U.S. at 237, 115 S.Ct. at 2117; *see also Fullilove v. Klutznick,* 448 U.S. 448, 482, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980) ("As a threshold matter, we

reject the contention that in the remedial context the Congress must act in a wholly 'color-blind' fashion."), *overruled on other grounds Adarand,* 515 U.S. at 200, 115 S.Ct. at 2097. In fact, where there is evidence of past discrimination, it is entirely within constitutional parameters to undertake efforts to remedy the effect of the prior, illegitimate practices, including, in extreme cases, the use of narrowly tailored racial (or gender) preferences. *See Croson,* 488 U.S. at 509, 109 S.Ct. at 730. Even in the absence of specific and identified discrimination, nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation. *See id.* at 509–10, 109 S.Ct. at 730.

In sum, appellants' allegations are insufficient to establish that Nassau County acted "because of" a desire to adversely affect appellants. The Nassau County defendants sought to design a police officers' exam which would reduce or eliminate the prior exams' adverse impact on black candidates. The 1994 exam was administered to all of the 25,000 candidates in identical fashion, regardless of race. The test was scored the same for all candidates, and no differential cutoffs were used. We conclude that the intent to remedy the disparate impact of the prior exams is not equivalent to an intent to discriminate against non-minority applicants. Accordingly, we affirm the district court's determination that appellants can prove no set of facts which would state a claim for intentional discrimination.

### b. *Discriminatory Impact*

Appellants submitted during oral arguments that they were prejudiced because the 1994 exam did not include any of the cognitive sections which had been administered to the applicants. They argue that they would have performed better had those cognitive sections been included. We find that appellants fail to set forth allegations which would support a claim that they were adversely impacted by the

redesign of the police officers' entrance exam.

Appellants certainly suffered no discriminatory impact in the administration or scoring of the facially neutral examination. On the contrary, even though the redesigned 1994 exam decreased the adverse impact on black applicants, noticeable adverse effects remained. Appellants concede that, on average, they scored higher than black applicants on the 1994 exam. Although appellants may have performed even better had the 1994 exam included cognitive sections, we fail to see how they can establish a claim for prejudice in light of this concession.

Although not binding on this court, we find the Tenth Circuit's ruling in a similar case extremely persuasive. In *Byers v. City of Albuquerque,* 150 F.3d 1271 (10th Cir.1998), the Tenth Circuit found that a police department did not discriminate against those appellants, several white police officers, in its promotional process. The alleged discriminatory action was the lowering of the written test score needed to proceed to the next round of the selection process by one point. *See id.* at 1276. That Circuit held that since the qualifying score was lowered for *all* applicants, regardless of race, the plaintiffs were neither excluded from full .consideration because of their race, nor were they disadvantaged because of their race. *See id.* As such, the court concluded that those plaintiffs failed to show that they were harmed by the score adjustment. *See id.*

*Byers* directly bears on this case, where all of the applicants to the Nassau County Police Department were given the same test and were scored in the same manner. Like the *Byers* plaintiffs, appellants before us have not been excluded from full consideration because of their race or gender. If appellants continued to score higher than black candidates, on average, the exam did not impair or disadvantage these appellants in favor of African–American applicants. Thus, appellants are unable to set forth a claim that they endured any dispa-

rate impact as a result of the design and administration of the 1994 examination.

## B. Title VII

Appellants also allege that Nassau County violated § 703 of Title VII of the 1964 Civil Rights Act, codified at 42 U.S.C. § 2000e–2(a)(1). We find appellants' position meritless.

Section 703 provides that it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge an individual on the basis of race, national origin, religion or gender. A violation of § 703 can arise either through disparate treatment or disparate impact.

A disparate treatment claim alleges that the employer treats some people less favorably than others because of race. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). As part of a disparate treatment claim, the plaintiff must establish that the employer acted with the intent to discriminate. *See id; see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). As discussed earlier, appellants fail to establish any intent to discriminate against them in Nassau County's efforts to craft an exam which lessens the discriminatory impact on minority candidates. Accordingly, appellants are unable to establish a disparate treatment claim under Title VII.

Disparate impact claims involve employment practices which are facially neutral, but fall more harshly on one group than another and cannot be justified by some business necessity. *See International Brotherhood,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Appellants cannot show that the 1994 exam "fell more harshly" upon them. Although the 1994 exam reduced the adverse impact on black applicants, there was still an adverse impact present. Thus, appellants, on average,

scored better than black applicants on the redesigned 1994 exam. As appellants cannot establish that they were injured or disadvantaged in some way, they fail to make out a claim for disparate impact.

## C. Sections 106 and 107 of the Civil Rights Act

Appellants contend that Nassau County violated §§ 106 and 107 of the 1991 Civil Rights Act, codified at 42 U.S.C. §§ 2000e–2(*l*), 2(m). Both of these claims are also disposed of easily.

Section 106 prohibits employers from adjusting scores, using different scores, or otherwise altering the results of employment related tests on the basis of race, color, gender or religion. The statute, on its face, clearly prohibits methods which utilize different scoring techniques or adjust candidates' scores on the basis of race. *See Fioriglio v. State of New Jersey Dep't of Personnel*, Civ. No. 95–3422, 1996 WL 599400, at *5 (D.N.J. Oct.15, 1996) ("The defendants changed the testing criteria and applied the new criteria evenhandedly to each and every score, not just to the scores of minority candidates. Thus, plaintiff fails to convince the court that the employment practice violates [§ 106] ....."), *aff'd*, 166 F.3d 1205 (3d Cir.1998). The legislative history of the statute also confirms that it intended to prohibit "race norming" and other methods of using *different* cut-offs for different races or altering scores based on race. *See generally* 137 Cong. Rec. H9529 (1991); 137 Cong. Rec. S15476 (1991). In the case before us, the 1994 exam was scored in the same manner for all applicants; no differential cutoffs were employed. Thus, appellants fail to adequately allege a claim under § 106.

Section 107 of the 1991 Civil Rights Act provides that an unlawful employment practice is established when the complainant demonstrates that race was a motivating factor for an employment practice even though other legitimate factors also motivated the employment decision.

That section was plainly included to benefit plaintiffs in "mixed motive" employment discrimination cases by confirming that race need not be the sole motivating factor for an adverse employment action. *See Fuller v. Phipps*, 67 F.3d 1137, 1142–44 (4th Cir.1995); *see also* 137 Cong. Rec. H9529, 137 Cong. Rec. S15476. This, however, is not a "mixed motive" case. "Mixed motive" cases arise in employment discrimination suits brought under the statutory scheme of Title VII or other related employment discrimination laws. *See generally Fuller*, 67 F.3d at 1141–44; *Stratton v. Dep't for Aging for City of New York*, 132 F.3d 869, 878–79 & nn. 4–5 (2d Cir.1997) (reviewing the mixed motive and pretext frameworks in employment discrimination cases). The instant suit is entirely devoid of any Title VII claims. Rather, the matter before us is primarily a constitutional challenge resting on the Fourteenth Amendment. Accordingly, appellants also fail to establish a claim under § 107.

## D. Miscellaneous Arguments

Appellants make several, smaller arguments which can be summarily discussed and dismissed.

First, appellants allege that the district court erred in not allowing them leave to replead. When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint. *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990). Although the decision to grant leave to amend is within the discretion of the court, refusal to grant leave must be based on a valid ground. *See id.* However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 76 (2d Cir.1998), *cert. denied*, — U.S.

——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999).

Although appellants assert that they specifically requested the right to re-plead, our review of the record does not confirm that appellants indeed requested the right to replead. Even if such a request was made, however, it does not appear that Judge Mishler abused his discretion in dismissing the complaint without granting leave to replead. There is nothing to suggest that appellants could replead in a fashion which would sufficiently allege that Nassau County harbored an intent to discriminate against them simply by attempting to minimize the adverse impact on black and minority applicants. Additionally, appellants remain unable to allege discriminatory impact as the factual background does not support a claim that they were differentially impacted by the 1994 exam. Accordingly, the district court did not abuse its discretion in dismissing appellants' claims without granting the right to replead.

Finally, appellants assert that the district court looked beyond the pleadings and relied on the TDAC Report during its consideration of the motion to dismiss for failure to state a claim. Appellants specifically take issue with the portion of Judge Mishler's opinion which states: "[w]e accept the United States and Nassau County Defendants' summary of the Project Technical Report as stated in their memorandum in support of their motions to dismiss and append a copy of the same to this memorandum of decision and order."

In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991). If a judge looks to additional materials, the motion should be converted into a motion for summary judgment. *See id.* Where, however, the court simply refers to supplementary materials, but does not rely on them or use them as a basis for its decision, the 12(b)(6) motion is not converted into a motion for summary judgment. *See id; see also Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir.1992) (refusing to find that a district court's judgment relied on materials outside the complaint when the judgment was adequately supported by information contained in the "four corners" of the complaint).

In the case at bar, the only reference to the TDAC Report is in the district court's recitation of the factual background of the case. In a section entitled "Development of the 1994 Exam," the court discussed the historical background of the 1994 exam and adopted the Defendants' summary of the TDAC Report presented in their memorandum in support of their motions to dismiss. However, the court did not refer to the Report in the portion of its opinion which discusses and evaluates appellants' claims. We determine that the court's adoption of the summary in its statement of the facts is more aptly characterized as a mere reference to the TDAC Report. There is nothing to suggest that the court actually relied on the Report or grounded its decision in the findings of the Report. Thus, the district court did not err in adopting the summary of the TDAC Report in the factual portion of its Memorandum of Decision.

## III. CONCLUSION

Nassau County sought to design a police officers' entrance examination which would reduce the discriminatory impact of its hiring practices on minority candidates. Although the decision to redesign the exam certainly took race into account, the exam was administered and scored in a wholly race-neutral fashion. We conclude that race-neutral efforts to address and rectify the racially disproportionate effects of an entrance examination do not discriminate against non-minorities. On that basis, we find that the 68 white and Latino

appellants, male and female, in this case fail to state a claim under the Equal Protection Clause, § 703 of Title VII, and §§ 106 and 107 of the Civil Rights Act of 1991.

Further, the district court did not err in: (1) not granting Appellants the right to replead, and (2) referring to the TDAC Report.

For the foregoing reasons, we **AFFIRM** the Memorandum of Decision and Order entered by the Honorable Jacob Mishler, District Judge for the Eastern District of New York.