**Kyle MORRIS and William Richert, Plaintiffs,**

v.

**CASTLE ROCK ENTERTAINMENT, INC., Alan Horn, Rob Reiner, Aaron Sorkin, Sally Burmeister, Writers Guild of America, West, Inc., Richard Heller and Warner Television, Inc., Defendants.**

**No. 01 Civ.9709 (VM).**

United States District Court, S.D. New York.

Feb. 14, 2003.

Roger L. Fidler, New York City, for plaintiffs.

Franklin K. Moss, Gillian Costello, Spivak, Lipton, Watanabe, Spivak & Moss, New York City, for defendants.

### DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiffs Kyle Morris ("Morris") and William Richert ("Richert," and together with Morris, "Plaintiffs") filed a complaint (the "Complaint") against Defendants Castle Rock Entertainment, Inc. ("Castle Rock"), Alan Horn, Rob Reiner ("Reiner"), Aaron Sorkin ("Sorkin"), Sally Burmeister, Writers Guild of America, West, Inc. ("WGA"), Richard Heller and Warner Television, Inc. ("WTI") (collectively, the "Defendants") alleging that Defendants had (i) breached certain contracts with the Plaintiffs, (ii) infringed certain copyrighted materials of Plaintiffs, (iii) violated the Lanham Act, (iv) committed fraud and (v) engaged in a conspiracy against the Plaintiffs.[1] Defendants in turn filed a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint in its entirety. By Order dated January 31, 2003, the Court granted Defendants' motion and indicated that its findings, reasoning and conclusions would be set forth in a separate decision to be made available to the parties. Accordingly, for the reasons discussed below, Defendants' motion is GRANTED.

### I. FACTS

In October of 1980, Plaintiffs wrote an original treatment for a film they titled "The President Elopes" (the "Film"), which involved a widowed President raising his young daughter and attempting to begin a new romance. After completing the treatment, Morris entered into a contract with Richert International Corporation, Inc. ("RIC"), which provided for an equal split of all revenues arising from the sale of any rights of the Film. Shortly thereafter, RIC signed a contract (the "Contract") with Walt Disney Productions ("WD") in which Plaintiffs agreed to work on revisions of the treatment and, at WD's option, a screenplay of the Film. RIC also assigned all of its intellectual property rights for the Film to WD.

---

1. Plaintiffs originally filed the Complaint before Judge John S. Martin of this Court, who found deficiencies in it and gave opportunity to replead. The Complaint now before the Court endeavored to correct the deficiencies Judge Martin noted. This Court is not persuaded that Plaintiffs have succeeded in doing so.

Over the next four years, the Contract was sold various times to different movie studios, while Richert continued writing new drafts of the screenplay. In 1985, Universal Pictures ("Universal") purchased the Contract and obtained involvement in the project by Wildwood Films ("Wildwood"), a production company affiliated with the actor and director Robert Redford ("Redford"). After several years of development, during which time other screenwriters attempted to draft new versions of the Film, Universal and Wildwood asked Richert to write a new draft of the Film. Subsequently, in 1992, Reiner, as a representative of Castle Rock, the production company with which he was affiliated, approached Redford and agreed to jointly produce the Film with Wildwood.

Later on in 1992, Castle Rock hired Sorkin to write a new screenplay with a similar concept as the one on which the Film was based. In 1994, Wildwood sold the Contract to Castle Rock,[2] which by this time was producing a film called "The American President" that had been written by Sorkin. In May of 1995, Castle Rock instituted proceedings with the WGA to ask that Sorkin receive sole writer's credit for "The American President." Morris protested this request, and consequently the WGA established an arbitration panel (the "Panel") to determine whether Sorkin should receive sole credit for the screenplay to "The American President." The Panel began the arbitration process on September 7, 1995 and, on September 29, 1995, concluded that Sorkin deserved sole credit. "The American President" was subsequently released on November 17, 1995, and Sorkin later went on to create and produce a television show

about the daily workings of the White House titled "The West Wing."

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Dismissal of a complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court accepts all well-pleaded factual assertions in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also McGinty v. State of New York*, 193 F.3d 64, 68 (2d Cir.1999). The court may not consider matters outside the pleadings, *see Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 n. 1 (2d Cir.1999), but may review "any written instrument attached to [the Complaint] as an exhibit...." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citation omitted).

### B. *PLAINTIFFS' COPYRIGHT CLAIMS*

▬ Plaintiffs allege that the production of both "The American President" and "The West Wing" infringed on Plaintiffs' copyrighted material, namely "The President Elopes." In order to prevail on a claim of violation of copyright, a copyright plaintiff must first establish (1) ownership of a valid copyright and (2) copying of constituent original elements of plaintiff's work. *See Feist Publications, Inc. v. Ru-*

---

**2.** The Complaint describes Universal as having purchased the Contract in 1985, but then later contends that Wildwood sold the Contract to Castle Rock without explaining how

the Contract came to be owned by Wildwood. The Court finds this discrepancy confusing but irrelevant to its final analysis.

*ral Tel. Serv. Co., Inc.,* 499 U.S. 340, 360, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

Plaintiffs fail to establish the first element of this test. Indeed, the Contract—attached to the Amended Complaint as an exhibit—clearly states that all work produced by the Plaintiffs for RIC shall be done in an employer-for-hire relationship, with all copyrights assigned by Plaintiffs first to RIC and then from RIC to WD. (Amended Compl., Exh. A, ¶ 11.) The language in this assignment provision is unambiguous. As part of the agreement, WD obtained

> (i) [t]he copyright ... and all now or hereafter existing rights of every kind or character whatsoever pertaining to said work, and the title thereof, whether or not such rights are now known, recognized or contemplated; and
>
> (ii) [t]he complete, unrestricted, unconditional and unencumbered title in and to said work, and all results and proceeds of [Plaintiffs'] services hereunder, for all uses and purposes whatsoever.

*(Id.)*

Plaintiffs contend that they can reclaim their copyright because of an alleged breach of both Paragraph 28 of the Contract and of an implied covenant of good faith. However, most courts that have considered the issue have rejected the notion that the creator of a work for hire may reclaim the copyright in his work once there has been a breach of the work for hire agreement by the commissioning party. *See Warren v. Fox Family Worldwide, Inc.,* 171 F.Supp.2d 1057, 1072–73 (C.D.Cal.2001) (asserting that the "weight of authority" regarding reclamation of copyrights by plaintiffs in the face of a material breach of the contract "is to the contrary"); *see also Royal v. Leading Edge Prod., Inc.,* 833 F.2d 1, 3–4 (1st Cir.1987) (holding that "there [was] neither authority nor precedent for the asser-

tion that [the] breach of a *royalty agreement alone* catalyzes an implicit exception to the work-made-for-hire doctrine.") (emphasis original).

In similar cases, courts have justified rescission of a licensing agreement due to a breach only when the breach "is of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.... [The breach must constitute] a total failure in the performance of the contract." *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 586 (9th Cir.1993) (quotations omitted); *see also id.* ("After considerable performance, a slight breach which does not go 'to the root' of the contract will not justify termination"). The Court is not persuaded by any of the Plaintiffs' allegations that any such breaches occurred here. Even if such a termination of the Contract occurred, the Contract explicitly stated that such termination would not affect WD's ownership of the rights with respect to the work produced by the Plaintiffs. (Amended Compl., Exh. A, ¶ 13.) In addition, the Contract contained no explicit rescission clauses that would allow the Plaintiffs to reclaim their copyright.

■ Plaintiffs alternatively attempt to argue that the Contract should be held unenforceable and the copyrights should therefore return to the Plaintiffs because the Contract as written would allow an unconscionable result. Plaintiffs allege this unconscionable result to be the frustration of the intent of the Contract to exchange "intellectual property for compensation, both future and current," which occurred when Castle Rock bought the Contract from WD in order to take the Film out of production. (Memorandum in Opposition to Defendants' Motions to Dismiss Complaint, dated October 11, 2002, at 11.)

■ The common law doctrine of unconscionability looks to the terms of the contract at the time the parties enter into an agreement. A substantively unconscionable bargain is one which "no man in his senses and not under delusions would make on one hand, and ... no honest and fair man would accept on the other." *Doctor's Associates, Inc. v. Jabush,* 89 F.3d 109, 113 (2d Cir.1996) (citations omitted). In the instant matter, the Court is not persuaded that the Contract represents an unconscionable bargain. The intent of the Contract was to pay Plaintiffs to write a script, one that had the possibility of eventually becoming a full-length major motion picture, but just as likely could have been discarded and never produced. Nothing in the Contract offers guarantees of production. If the Court were to find that the Contract was now invalid simply because it did not result in an actual production, it would be encouraging every failed writer, director and producer in the entertainment world to litigate based on their own unfulfilled production deals.

Furthermore, even accepting Plaintiffs' version of the facts and drawing reasonable inferences in their favor, it is evidence from the pleadings and agreements before the Court that Castle Rock acquired the Contract for the purpose of preventing another film with superficial similarities to the one it already had in production from being made and thus competing with Castle Rock's film. Plaintiffs do not allege that such a purchase violated any antitrust or other anticompetitive laws, and a sale for such a purpose would have been fully within WD's rights under the Contract. Finally, the Court is not persuaded by any of Plaintiffs' allegations that the Contract's terms shock the conscience or appear so one-sided or unfair that no individual "in his senses and not under delusions" could accept them. *Doctor's Associates, Inc.,* 89 F.3d at 113. The Court, therefore, rejects Plaintiffs' unconscionability argument.

### C. *PLAINTIFFS' LANHAM ACT CLAIM*

■ Plaintiffs allege that the release of both "The American President" and "The West Wing" violated the Lanham Act by misrepresenting to the public who the true creator of the movie and television series was. Section 43 of the Lanham Act, 15 U.S.C. § 1125, "prohibits any misrepresentation likely to cause confusion as to the source or the manufacturer of a product." *Lipton v. The Nature Co.,* 71 F.3d 464, 472 (2d Cir.1995). However, because protection of intellectual property under the Lanham Act does not extend beyond that provided by copyright law, the dismissal of Plaintiffs' copyright claims also results in the dismissal of Plaintiffs' Lanham Act claims. *See Robinson v. Viacom International, Inc.,* 1995 WL 417076, at *11 (S.D.N.Y.1995); *Productivity Software Int., Inc. v. Healthcare Technologies, Inc.,* 1995 WL 437526, at *7 (S.D.N.Y.1995).

### D. *PLAINTIFFS' BREACH OF CONTRACT CLAIM*

■ Plaintiffs argue that Castle Rock and WTI breached the Contract by failing to pay Plaintiffs compensation as required by Section 28 of the Contract. However, any obligation by Castle Rock and WTI under Section 28 to pay such compensation was dependent on a specific condition occurring, and Plaintiffs fail to allege that the necessary condition precedent occurred in order to invoke Section 28.

Section 28 of the Contract allows for an upward adjustment in the sums paid to the Plaintiffs if

another writer is later assigned to write literary material based on [Plaintiffs' work and] the Writers Guild of America,

West, Inc. determine[s] that [Plaintiffs are] to share writing credit hereunder with such other person.

(Amended Compl., Exh. A, ¶ 28.)

However, the WGA did not determine that the Plaintiffs were to share credit with Sorkin. To the contrary, the WGA concluded that Sorkin was entitled to sole credit for "The American President." Because this condition precedent never occurred, this portion of the Contract never came into effect. *See Diffusion Finance S.A.R.L. v. Smith,* 1997 WL 272391, at *2 (S.D.N.Y.1997) ("If the condition precedent does not occur and is not excused according to the express or implied terms of the contract, the conditional duty is discharged."). Thus, Castle Rock and WTI could not have breached this section of the Contract.

### E. *PLAINTIFFS' FRAUD AND CONSPIRACY CLAIMS*

■ In the remainder of the Amended Complaint, Plaintiffs argue that Defendants committed fraud and conspired to defraud. Specifically, Plaintiffs allege that Sorkin made misrepresentations with the intent to deceive the Panel, and that other Defendants participated in this conspiracy.

■ Plaintiffs do not specify which state's law they rely on for their fraud claim, but regardless of whether they choose New York law, where this action was filed, or California law, where the WGA arbitration took place, both states have nearly identical requirements to prove common law fraud. Under New York law, an action for common law fraud requires a plaintiff to establish each of the following elements: that the defendant (1) made a material, false statement; (2) knowing that the representation was false; (3) acting with intent to defraud; and that plaintiff (4) reasonably relied on the false representation; and (5) suffered damage

proximately caused by the defendant's actions. *See Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 310 (2d Cir.1994). California law similarly requires a plaintiff to prove that the defendant made a false representation, with knowledge of its falsity, intending to deceive or induce reliance thereon, and that the plaintiff actually and reasonably relied on the representation, thereby suffering damages. *See Glenn K. Jackson Inc. v. Roe,* 273 F.3d 1192, 1201 (9th Cir.2001).

■ Under either test, Plaintiffs fail to state a claim by neglecting to allege how the Plaintiffs relied on any alleged misrepresentations by Sorkin. In the instant matter, even taking all facts as Plaintiffs allege as true, the Court can at most determine that the Panel relied on Sorkin's alleged misrepresentations and that this reliance led the Panel to rule in a way that was adverse to the Plaintiffs' interests. However, such third-party reliance is not enough to sustain a claim for common law fraud. *See Westwood–Booth v. Davy–Loewy Ltd.,* 1999 WL 219897, at *4 (E.D.Pa. 1999) ("A plaintiff cannot state a claim for fraud based on a third party's reliance on a misrepresentation, even when it was made to influence the third party foreseeably to act in a manner detrimental to the plaintiff."); *see also Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 354 (E.D.N.Y. 2000) (noting that in general, New York law requires a plaintiff to show direct reliance, not third-party reliance, in fraud claims).

■ Without a fraud claim, Plaintiffs' conspiracy claim also cannot stand. Plaintiffs specifically made their allegation of conspiracy under California law, but "[u]nder California law, there is no separate and distinct tort cause of action for civil conspiracy." *Entertainment Research Group v. Genesis Creative Group,* 122

F.3d 1211, 1228 (9th Cir.1997) (citing *Applied Equip., Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454, 459 (1994)). As a result, in order for Plaintiffs to have a valid civil conspiracy cause of action, there must be a specific tort upon which they could base their conspiracy claim. *See id.* Since the Court has determined above that Plaintiffs' tort claim for fraud fails to state a claim, Plaintiffs' claim of conspiracy to commit fraud must naturally fail as well.

### F. *LEAVE TO AMEND*

According to Rule 15(a), leave to amend the complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); see also *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir.1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."). However, "a district court has the discretion to deny leave to amend if an amendment would be futile." *Mobile Data Shred, Inc. v. United Bank of Switzerland*, 2000 WL 351516, at *8 (S.D.N.Y.2000). In the instant case, Plaintiffs had ample opportunity to replead their Complaint after being given the chance by Judge Martin. In light of the fact that this Court found such repleading to be unsatisfactory, the Court is not persuaded that Plaintiffs would be able to amend the Complaint in a manner which would survive dismissal, and consequently, any opportunity to replead is rightfully denied. *See Hayden*, 180 F.3d at 53.

### III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Court's Order dated January 31, 2003 in this action is amended to incorporate the discussion set forth above; and it is finally

**ORDERED** that Defendants' motion to dismiss is granted.

The Clerk of Court is directed to close this case.

**SO ORDERED.**