**Christopher BARBERA,
et al., Plaintiffs,**

**v.**

**METRO–DADE COUNTY FIRE
DEPARTMENT, Defendant.**

**No. 97–2068.**

United States District Court,
S.D. Florida.

March 28, 2000.

Jane M. Letwin, Jane Letwin, Fort Lauderdale, Neil H. Chonin, Chonin Sher & Navarrete, Coral Gables, John James Chamblee, Jr., Chamblee & Johnson, Tampa, for Grant Danskine.

Lee Allen Kraftchick, Dade County Attorney's Office, Miami, for Metro Dade Fire Dept. and R.D. Paulison.

### *ORDER & OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon Defendant Metro–Dade County Fire Department's (hereinafter the "Department") motion for summary judgment. For the reasons that follow, the Department's motion is granted.

### I. BACKGROUND

Unfortunately, the Department has a not so distant history of systemic employment discrimination against racial and ethnic minorities and women. *See generally Peightal v. Metropolitan Dade County,* 940 F.2d 1394 (11th Cir.1991); *Danskine v. Metro Dade County Fire Dept.,* 59 F.Supp.2d 1252 (S.D.Fla.1999). In an effort to rectify its past wrongs, the Department voluntarily adopted an affirmative action program in 1984. "The long-term goal of the affirmative action plan was to partially relieve the underrepresentation of minorities and women in the Fire Department." *Peightal v. Metropolitan Dade County,* 815 F.Supp. 1454, 1458 (S.D.Fla.1993), *aff'd,* 26 F.3d 1545 (11th Cir.1994); *see also Danskine,* 59 F.Supp.2d at 1254 ("The Fire Department's ultimate goal, pursuant to the affirmative action plan, was for 36% of its entry level firefighters to be female."). Under the affirmative action plan, the Department has established hiring goals for white males, white females, black males, black females, Hispanic males, and Hispanic females, in an effort to achieve a demographic makeup that more closely

parallels that of Miami–Dade County. *See Peightal*, 815 F.Supp. at 1458.

The Department has attempted to meet those hiring goals from the pool of qualified applicants. *See id.* at 1458–60. The pool of qualified applicants is made up of those individuals who successfully complete each of the progressive steps in the Department's hiring process. Currently, those steps consist of the: (1) initial screening; (2) written examination; (3) physical ability test[1] (hereinafter the "PAT"); and (4) oral interview process. *See Danskine*, 59 F.Supp.2d at 1254–55 (describing the Department's multifaceted hiring process). Applicants who successfully complete the final stage of the application process, the oral interview, are then ranked and placed on the eligibility list. *See id.* at 1255. Although the applicants who successfully complete each stage of the application process are ranked, the Department's hiring policy allows for hiring from anywhere on the eligibility list, regardless of rank. *See id.* The affirmative action plan calls for out-of-rank hiring to fulfill the Department's hiring goals. *See id.* Consequently, some female and minority applicants have been hired ahead of white male applicants who ranked higher on the Department's eligibility list.

Since its adoption, several lawsuits have been brought by applicants to the Department, challenging the legality of the affirmative action program. To date, the program has survived every challenge. At this time, the Department has reached its representational goals with regard to blacks and Hispanics. Therefore, the racial and ethnic components of the affirmative action program are no longer in effect. The Department, though, has still not met its representational goal with respect to females. Thus, the affirmative action plan remains in place with regard to gender, and lower ranked females from the eligibility list are still given preference over males.

In July of 1997, this lawsuit was initiated by over sixty male applicants for entry level firefighter positions during the recruitment period commencing in 1994, challenging (1) the continued viability of the Department's gender based affirmative action plan and (2) the Department's testing procedures. The Plaintiffs are divided into two groups, each group having a separate and distinct claim. The first, and larger, group of Plaintiffs consists of male applicants who passed the Department's written examination, but were not invited to continue further in the application process. Because of the large number of applicants (5,807) who successfully completed the written examination during the 1994 recruitment period, the Department conducted a "lottery" to select those individuals who would be invited to continue in the application process: Pursuant to the Department's affirmative action plan, females who passed the written examination were excluded from the lottery and allowed to advance to the next stage of the application process. After the lottery had eliminated the majority of applicants, 770 female applicants and 974 male applicants were invited to continue in the application process. The first group of Plaintiffs claimed that the Department's gender based hiring preferences, specifically the lottery, violated their right to equal protection of the law, guaranteed by the Fourteenth Amendment, and their right to be free of gender based employment decisions, secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. In an order dated July 23, 1999, the Court held that the Department's gender based affirmative action program was valid and therefore granted the Department's motion for summary judgment with regard to the claims of the first group of Plaintiffs. *See Danskine*, 59 F.Supp.2d 1252.

The second group of Plaintiffs (hereinafter simply "Plaintiffs") were selected to

---

**1.** In various submissions by the parties, the examination is referred to as the physical agility test rather than the physical ability test.

continue in the application process, after passing the written examination. They also passed the PAT, and all but two then went on to pass the oral interview process and were placed on the eligibility list.[2] No Plaintiffs were hired from the eligibility list. The Department, though, hired several lower ranked females from the eligibility list. Plaintiffs claim that the testing procedures employed by the Department favored female applicants, and consequently discriminated against male applicants, by maximizing the number of females that qualified for the eligibility list. Specifically, Plaintiffs point to modifications of the PAT, which they claim were made to increase the number of females passing the exam. By increasing the number of females on the eligibility list, Plaintiffs argue, the Department effectively ensured that female applicants would be hired rather than male applicants.

The Department has now moved for summary judgment, asserting that: (1) Plaintiffs were not treated less favorably than female applicants, aside from the affirmative action plan; (2) the Department's testing procedures were adopted for nondiscriminatory reasons; and (3) Plaintiffs suffered no cognizable injury from the Department's alleged illegal actions. Plaintiffs counter that the modifications of the testing procedures were made solely to favor females, discriminated against males, and violated Plaintiffs' rights secured by the Equal Protection Clause of the Fourteenth Amendment and Title VII.

2. Plaintiff Damond Harrell was rejected because he showed up late for his scheduled oral interview, and Plaintiff Peter Ramos was rejected because he did not pass the oral interview. See Second Amend. Compl. at 8.

3. The PAT required applicants to complete five tasks while wearing a twenty-two pound weight vest. See June 4, 1998 Dep. of David Santisteban at 18. Specifically, the applicants were required to: (1) carry a fifty pound hose up six flights of stairs; (2) pull a forty-eight pound weight inside a fourth story window; (3) pound a resistant beam with a nine pound mallet; (4) pull a one-hundred pound section of hose; and (5) drag the equivalent of a 175 pound person one hundred feet. Id.

## II. UNDISPUTED FACTS

Plaintiffs applied for positions as entry level firefighters in 1994. At that time, the Department had in place a remedial affirmative action plan, which gave preference to qualified female candidates over qualified male candidates. Qualified candidates were selected through a multifaceted, progressive selection process. One of the components of the selection process was the Department's PAT.[3] Before the 1994 recruitment process began, all of the Department's selection procedures, including the PAT, were validated to "ensure[ ] that the test questions or test items [were] relevant to the position" of entry level firefighter. June 4, 1998 Dep. of David Santisteban at 14.[4] The validation process was conducted by Dr. David Santisteban, Ph.D, a psychologist specializing in employment selection procedures. The PAT attempts to simulate the physical demands that a firefighter would face in the line of duty. As initially validated, applicants were required to complete the PAT in eight minutes. The PAT was twice modified, with Dr. Santisteban's approval, following the selection procedures initial validation.

The first modifications of the PAT occurred before any applicants completed the test. Prior to testing the 1994 applicants, the Department administered the PAT to several incumbent firefighters to assess the test's effectiveness. That run through revealed some minor problems

4. In the realm of employment discrimination, the terms "validated" and "valid" have distinct meanings. A "validated" exam is one that comports with the nondiscrimination standards of Title VII and the Uniform Guidelines on Employee Selection Procedures adopted by the EEOC. See Hayden v. County of Nassau, 180 F.3d 42, 46–47 & n. 3 (2nd Cir.1999). "A 'valid' exam is one which sufficiently measures a candidate's on the job performance." Id. at n. 3. In their moving papers, the parties have used the terms "validated" and "valid" interchangeably. This has led to some confusion as to the effect of the modifications of the PAT, which will be discussed infra Part IV(A)(2).

with the simulated obstacles. Notably, it was discovered that the window that applicants were to carry a fire hose through was higher than windows normally encountered by firefighters.[5] To remedy this, the Department added a platform below the window, in order to more accurately simulate the physical requirements of the job.

The Department also modified the PAT after it had initially begun testing the 1994 applicants. After the first few days of testing, it was observed that several of the applicants were having trouble with the hose hoist, due to the configuration of the model window that they were required to maneuver through while carrying a fire hose. The Department therefore modified the hose hoist station by (1) removing the window frame to create more room for the applicants and (2) placing a loop in the hose to make it easier to carry. At that time, the Department also ordered additional smaller sized gloves, after realizing that it did not have enough small sized gloves to accommodate all of the applicants. After these second modifications were made to the PAT, the Department invited all of the applicants who had previously failed the PAT to retake the test, with the benefit of the modifications. The eight minute passing time for the PAT was never altered.

From the pool of eligible applicants from the 1994 recruitment process, the Department ultimately hired 225 entry level firefighters. Sixty–Seven of the candidates hired were females, and 158 were males. Two-hundred and six applicants qualified for selection by the Department but were not offered positions. Of those qualified applicants not offered positions, 191 were males and fifteen were females.

### III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to assess the evidence to determine whether there is an actual need for a trial. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586,

590 (11th Cir.1994); *see also* Fed.R.Civ.P. 56(e) advisory committee's notes (stating that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for a trial"). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact." Fed.R.Civ.P. 56(c). If no material issue of fact exists, summary judgment avoids the needless delay and expense of a trial. *See* 6 James Wm. Moore et al., Moore's Federal Practice § 56.04(1) (2d ed.1996).

What the material facts are in a particular case is determined by the substantive law to be applied in the case. *Mulhall*, 19 F.3d at 590. "Material facts are those that might affect the outcome of the suit under the governing law." *Id.* Thus, the mere existence of a factual dispute will not preclude summary judgment. To avoid summary judgment, the factual question must be one that could determine the case.

The party moving for summary judgment is charged with the initial burden of demonstrating the absence of any question of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the party opposing summary judgment is afforded an opportunity to refute that showing. *Id.* at 324, 106 S.Ct. 2548. Rule 56 states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). Thus, the party opposing summary judgment cannot create a

---

5. This problem appears to have been a result of the dimensions of the tower at the Department's testing facility. *See* June 4, 1998 Dep. of David Santisteban at 41.

question of fact by simply denying the sworn evidence supporting the moving party's motion.

## IV. DISCUSSION

Plaintiffs contend that the Department has committed two distinct wrongs in connection with its testing procedures. Plaintiffs' primary grievance alleges that the Department illegally modified its testing procedures, specifically the PAT, to favor female applicants. With considerably less force, Plaintiffs also assert that the Department applied certain testing procedures in a discriminatory fashion. Each of these allegations will be addressed separately below; but, at the outset, the Court reiterates (1) that it has previously ruled that the Department's gender based affirmative action program is valid [6] and (2) that the issues currently before the Court concern the validity of the Department's testing procedures, not the affirmative action plan.

### A. The Modifications to the PAT

Plaintiffs contend that their federally protected rights to be free of gender based discrimination were violated by the Department's modifications to the PAT. Plaintiffs' argument is premised on the assumption that the modifications were perpetrated solely for the purpose of increasing the pool of qualified female applicants. Assuming that Plaintiffs are correct that the intent of the modifications was to increase the number of qualified female applicants, neither the Equal Protection Clause nor Title VII would be offended.

### 1. Broadening the Pool of Applicants Does not Constitute Discrimination

■ Plaintiffs' primary claim is somewhat unusual in that it maintains that the Department discriminated through an act of inclusion—broadening the pool of appli-

cants—rather than an act of exclusion, the traditional vehicle for claims of systemic discrimination. While the notion that the Department modified the PAT to increase the number of qualified female applicants may initially resinate of discrimination, upon closer inspection, it is evident that such a measure is nondiscriminatory and thus nonactionable. In the end, increasing the number of qualified female applicants has only one effect on male applicants: "Qualified [male] candidates simply have to compete with qualified [female] candidates." *United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion); *see also Duffy v. Wolle,* 123 F.3d 1026, 1039 (8th Cir.1997) ("The only harm to white males is that they must compete against a larger pool of qualified applicants. This, of course, is not an appropriate objection and does not state a cognizable harm.") (internal quotation marks and citation omitted), *cert. denied,* 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998).

The most thorough, and most illuminating, discussion concerning the distinction between inclusive and exclusive hiring practices is Judge Myron H. Thompson's opinion in *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535 (M.D.Ala.1995) (hereinafter *Shuford* II).[7] In *Shuford* II, Judge Thompson was called upon to approve a proposed partial consent decree in an action brought to remedy the long history of employment discrimination in Alabama's postsecondary educational system. *See generally id.* at 1543–47 (describing the history of the litigation). The partial consent decree, which was approved, applied to a class of females denied employment or promotion in the Alabama postsecondary educational system and a subclass of black females denied employment or promotion in the system. *See id.* at 1572–73 (identifying the class and sub-

---

**6.** That decision is currently on appeal to the Eleventh Circuit.

**7.** *Shuford* II is one of a number of reported opinions by Judge Thompson in the litigation

over the hiring and promotional practices of Alabama's postsecondary educational system. The first reported decision in the line (*Shuford* I) is *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511 (M.D.Ala.1994).

class). The partial consent decree required the Board of Education to institute certain remedial measures, including steps to increase the number of qualified female applicants. See at 1553–56. In analyzing the requirements of the partial consent decree, Judge Thompson distinguished between the measures that called for greater inclusion of female applicants and those that required some exclusion of male applicants. See id. at 1551 (explaining the distinction).

Inclusive measures are affirmative efforts undertaken by an employer to increase the number of qualified female or minority candidates in the applicant pool. See Duffy v. Wolle, 123 F.3d at 1039. The primary inclusive, remedial measure used by employers is recruitment of female and minority applicants. See Shuford II 897 F.Supp. at 1551. "Recruitment and other techniques of inclusion do not affect the selection process for hiring or promotion. Rather, inclusive techniques seek to ensure that as many qualified candidates as possible make it to the selection process." Id.; see also Duffy v. Wolle, 123 F.3d at 1039 ("An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment."). On the other hand, exclusionary measures, such as quotas and set asides, "select some candidates rather than others from a pool." Shuford II 897 F.Supp. at 1551; see also id. (noting "selection by necessity requires excluding some people"). "Including more qualified candidates in the pool is, as seems obvious...both proper and desirable." Id. at 1552. Since inclusive measures expand the field of applicants rather than deny opportunity to a class of people (i.e., discriminate), they are not subject to any heightened scrutiny. See Allen v. Alabama State Bd. of Educ., 164 F.3d 1347, 1352 (11th Cir.1999); Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1557–58 (11th Cir.1994); Sussman v. Tanoue, 39 F.Supp.2d 13, 25–26 (D.D.C.1999) (collecting cases).

The PAT modifications sought to adjust the examination to reflect more accurately the physical demands placed upon a firefighter. Plaintiffs argue that because this resulted in more females passing the PAT, and consequently more females being included in the pool of qualified applicants, the modifications must constitute illicit gender discrimination. This simply does not follow. Just as it would not constitute illicit discrimination if the Department, for legitimate purposes, modified the examination in a manner that adversely affected females, modifications that increase the number of females passing the PAT do not, in-and-of-themselves, constitute unlawful discrimination. That the Department was conscious of the physical differences between males and females and sought to minimize them, by eliminating obstacles that were not essential to the PAT but adversely affected females, does not change the analysis. Rather, it demonstrates the Department's efforts to include as many qualified female applicants in the hiring pool as possible, without excluding any qualified male applicants from the pool.

In Hayden v. County of Nassau, 180 F.3d 42, the Second Circuit was recently confronted with a challenge strikingly similar to Plaintiffs' challenge to the PAT modifications. There, it was "contend[ed] that by deliberately designing a[ ] [written] entrance exam which would minimize the adverse impact on black candidates [to the Nassau County Police Department], Nassau County necessarily discriminated against" white and Latino applicants. Id. at 47. In affirming the district court's dismissal for failure to state a claim upon which relief may be granted, the court unequivocally stated, "there is no doubt that appellants have failed to allege facts which, if proven true, would entitle them to relief," under the Equal Protection Clause or Title VII. Id. at 47–48. In its analysis, the court flatly rejected the contention that "designing the entrance exam so as to lessen the adverse impact on minority applicants" equates to discriminating against non-minority applicants.

*See id.* at 50–51. Race or gender consciousness simply does not, *ipso facto*, denote a discriminatory motive. *See id.* After all, as several courts have recognized, all anti-discrimination statutes and all other efforts to combat discrimination are expressly race and/or gender conscious. *See id.* at 49 (quoting *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir.), *cert. denied*, 525 U.S. 811, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998)); *Allen v. Alabama State Bd. of Educ.*, 164 F.3d at 1353. If a mere showing that an employer considered, and sought to limit, the adverse impact of testing procedures on minorities and/or women amounted to a discriminatory motive, efforts to remedy past discrimination against minorities and women would be "seriously stifle[d]." *See Hayden v. County of Nassau*, 180 F.3d at 51; *Allen v. Alabama Bd. of Educ.*, 164 F.3d at 1353 (noting that such scrutiny "would imperil Title VII, which requires covered employers to ensure that their selection processes do not result in unjustifiable discriminatory impact on African–American candidates").

Assuming, as Plaintiffs contend, that the modifications to the PAT were made to increase the number of qualified female applicants in the hiring pool (i.e., eliminate the adverse impact of the PAT on females), there is nothing unlawful about the modifications. The modifications were made for a·permissible purpose (to include qualified female applicants), they were instituted in a non-discriminatory fashion, and had no discriminatory effect. At most, the modifications increased the number of qualified female applicants in the hiring pool. As Judge Thompson aptly stated, that is "both proper and desirable." *Shuford* II, 897 F.Supp. at 1552.

## 2. The Modifications Did not Result in Unqualified Applicants Being Hired

■ Throughout their response to the Department's motion for summary judgment, Plaintiffs assert that the modifications of the PAT resulted in an "invalid" test, which allowed for unqualified females to be hired over qualified males. In support of this argument, Plaintiffs rely on the fact that the PAT was not re-"validated" by Dr. Santisteban after the modifications were made. Plaintiffs' argument confuses two terms-"valid" and "validated"-that have distinct meanings for purposes of evaluating employment examinations. *See supra* Note 3. As noted earlier, a "validated" exam connotes a test that complies with certain non-discrimination standards established by the E.E.O.C., while a "valid" exam connotes a test that sufficiently measures an applicant's ability to perform the responsibilities of the job. *See id.* Plaintiffs appear to contend that because of the modifications the PAT was not valid, i.e., it did not adequately measure an applicant's ability to perform the physical ·functions required of an entry level firefighter.[8] This position is wholly

8. If Plaintiffs are, in fact, attempting to argue that PAT was not properly validated in the sense that it did not comply with the E.E.O.C.'s nondiscrimination standards, they have failed to establish the necessary predicate to challenge the examination. That is, they have not demonstrated that the modified PAT had an adverse impact on males passing the examination. *See Firefighters Institute for Racial Equality v. City of St. Louis*, 616 F.2d 350, 356 (8th Cir.1980) (explaining the two-part inquiry in cases where the validation of an exam is undertaken). If properly made, such a claim would be cognizable only under Title VII. *See Tyler v. Vickery*, 517 F.2d 1089, 1095–97 (5th Cir.1975) (rejecting the proposition that the failure to have an exam validated under the E.E.O.C. guidelines could serve as the basis for an equal protection claim). Essentially, Plaintiffs would have to demonstrate that the modified PAT—a gender neutral examination—had a disparate impact on males and proceed under the familiar Title VII disparate impact analysis. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (discussing the analysis for challenging facially neutral tests); *see, e.g, Lanning v. Southeastern Pennsylvania Transp. Authority*, 181 F.3d 478 (3rd. Cir. 1999). Plaintiffs have failed to demonstrate that the modifications to the PAT had any sort of negative impact on males passing the examination, and logic dictates that the modifications would actually result in more, not fewer, males passing the examination.

without merit, as Plaintiffs' opinion of the adequacy of the selection criteria employed by the Department is of no significance.

Plaintiffs argue that as modified the PAT did not accurately measure an applicant's physical ability to serve as a firefighter. This may or may not be true. But the answer to that question is irrelevant to the issue in this case: whether or not the Department illegally discriminated against Plaintiffs because of their gender. The Department, like all other employers, need not hire the most objectively qualified candidates. Rather, it may utilize whatever criteria it chooses in deciding who is qualified for an entry level firefighter position, so long as those criteria are nondiscriminatory in both form and practice. See *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1525 (5th Cir.1993) (dismissing argument that objective competency exam that had no disparate impact could evidence discrimination on the basis that it was not an accurate measure of competency); *Moore v. Southwestern Bell Telephone Co.*, 593 F.2d 607, 608 (5th Cir.1979) (per curiam) ("If there is no substantial disproportionate impact on minorities, the test may be used whether valid or invalid, job-related or not job-related."). The Department has decided that the modified PAT-a gender neutral examination-is an accurate measure of an applicant's physical aptitude to serve as a firefighter. It is simply not the province of this Court to second guess such personnel decisions. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir.1999) ("This Court repeatedly has stated that it will not second-guess a company's legitimate assessment of whether an employee is qualified for a particular position."). As Judge Hill explained, in a similar context:

> Perhaps in this case the administrator foolishly placed too much emphasis on the college degree held by the person hired as supervisor; perhaps he chose a supervisor at barbecues or from among his "drinking buddies." If this sort of management ill serves the hospital, the hospital may wish to make other arrangements. Unless, though, the administrator has been shown, by direct or circumstantial evidence, to have taken the action he did as an act of discrimination against [the plaintiff] on account of [the plaintiff's] [protected class], it is not a federal court matter.

*Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 803 (11th Cir.1988) (Hill, J., specially concurring), *amended by* 850 F.2d 1549 (11th Cir.1988) (per curiam). Perhaps the Department has made a foolish decision in deciding that the modified PAT is an accurate measure of an applicant's ability to serve as a firefighter. But since the modified PAT discriminates in neither form nor practice, and was not adopted out of gender animus, the Department may choose, wisely or unwisely, to employ it, regardless of Plaintiffs' conjecture as to its accuracy.

### B. Unequal Application of Testing Procedures

Aside from their primary claim that the Department's modifications of the PAT constitute illegal gender discrimination, Plaintiffs also allege that certain testing procedures were applied in a discriminatory fashion. Specifically, Plaintiff Damond Harrell contends he was eliminated from the applicant pool for showing up late for his oral interview, while female applicants were excused for showing up late; Plaintiff Pedro Ramos contends that after failing his oral interview he was not offered a second oral interview, while female applicants who failed their interviews were extended the opportunity to re-interview; and Plaintiffs Eric Ferrer, Jason Swenson, Christopher Barbera, Pedro Ramos, and Anthony Gomez contend that when they took the PAT the platform at the hose hoist station, which was one of the modifications implemented by the Department, was not available to them. The Court will address each of these claims.

### 1. Allegations that Female Applicants Were Given Preference at the Oral Interview Stage.

In Plaintiffs' second amended complaint, Plaintiffs Harrell and Ramos allege that

they were disqualified at the oral interview stage of the selection process, under circumstances where female applicants were not disqualified. In its motion for summary judgment, the Department has come forward with evidence refuting these allegations, demonstrating that females were disqualified for the same reasons as Harrell· and Ramos. In Plaintiffs' joint response to the motion for summary judgment, the allegations of Harrell and Ramos are not addressed. Thus, the Department's sworn evidence refuting those allegations has gone unrebutted. Accordingly, the Department is entitled to summary judgment on the claims alleging illegal discrimination at the oral interview stage. *See generally supra* Part III (discussing the summary judgment standard).

### 2. Allegations that the Platform Was not Present

 Five Plaintiffs have submitted sworn affidavits stating that the platform was not present at the hose hoist station, when they took the PAT. The hose hoist station was modified to include the platform before any of the 1994 applicants were administered the PAT. *See supra* Part II. Thus, these five Plaintiffs have alleged that they were administered a more difficult examination than the other 1994 applicants, male and female alike. All five of these Plaintiffs nonetheless passed the PAT.

"In an action alleging class-wide discrimination plaintiffs must 'establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure-the regular rather than the unusual practice.'" *Griffin v. Carlin,* 755 F.2d 1516, 1525 (11th Cir.1985) (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). As modified to include the platform at the hose hoist station, the PAT was administered to 1339 applicants–703 males and 636 females.[9] After extensive discovery in this case, Plaintiff has produced evidence, which the Court accepts as true at this stage, that five males, or less than six percent of the males to take the modified PAT, were administered the test without the benefit of the platform. Plaintiffs' have produced no other evidence suggesting that the PAT was administered in a gender biased manner. The fact the five male applicants were improperly administered the PAT is simply insufficient to support a claim that the Department, as a regular course of business, administered the PAT in a gender biased fashion.[10]

### V. CONCLUSION

The modifications to the PAT were made for a legitimate purpose; to maximize the number of qualified female applicants in the hiring pool. Plaintiffs' contention that, by increasing the number of qualified female applicants in the hiring

9. There were two separate testing periods for the 1994 recruitment process during which the PAT was administered, the first in 1995 and the second in 1996. Aside from the 1339 applicants to be administered the PAT during these two periods, there were 284 applicants who failed to appear for the examination—for a total of 1623 applicants who were scheduled to take the PAT. This leaves a total of 121 applicants, from the 1774 who passed the initial screening and the written examination, unaccounted for. The Court assumes that these applicants voluntarily withdrew from the selection process.

10. To the extent that Plaintiffs Eric Ferrer, Jason Swenson, Christopher Barbera, Pedro Ramos, and Anthony Gomez may contend that they suffered individual instances of gender based discrimination with regard to the absence of the platform, they have presented no evidence to suggest that the absence of the platform was the result of gender bias, as opposed to a simple mishap in the test administration. Discriminatory motive or intent is, of course, an essential element of a claim of disparate treatment. *See Griffin v. Carlin,* 755 F.2d at 1525. The Court notes that Plaintiffs, in fact, presented no argument with concern to the issue of the absence of the platform. Rather, they simply included it in their factual recitation of the case and submitted the affidavits of Ferrer, Swenson, Barbera, Ramos, and Gomez, without further explanation.

pool, the Department somehow discriminated against qualified male applicants is of no avail. Inclusive measures, such as the Department's efforts to eliminate non-essential obstacles that adversely affect females, simply do not constitute illicit discrimination. Plaintiffs have also failed to present any evidence suggesting that the Department's testing procedures were administered in a gender biased manner. Accordingly, the Department's motion for summary judgment is GRANTED.