[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 12, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-14493

_____

D. C. Docket No. 97-02068-CV-SH

GRANT DANSKINE,
DARREN ALTARAC, et al.,

Plaintiffs-Appellants,

versus

MIAMI DADE FIRE DEPARTMENT,
R. D. PAULISON, Fire Chief,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 12, 2001)**

Before CARNES and MARCUS, Circuit Judges, and HAND[*], District Judge.

MARCUS, Circuit Judge:

---

[*]Honorable W.B. Hand, U.S. District Judge for the Southern District of Alabama, sitting by designation.

In this appeal, we address once again the legality of the Miami-Dade County Fire Department's affirmative action plan. Twice before this Court has addressed the plan, in litigation primarily challenging preferences awarded on the basis of race and national origin. Those aspects of the plan have long since been terminated. The plan continues to give preferential treatment to women, however, and it is that aspect of the plan which we consider today.

Appellants are males who applied unsuccessfully for entry-level firefighter positions with the County Fire Department between 1994 and 1997. They contend that the County's affirmative action plan for female firefighters violates Title VII and the Equal Protection Clause. In particular, they assert that the County's "long-term" hiring goal of 36% women is unreasonably high, because it relies upon general population figures to determine the appropriate number of women firefighters, when in actuality (they say) more refined data suggests that women are simply less interested and less physically qualified than men. Because the 36% figure is too high, Appellants maintain that we should invalidate the plan insofar as it continues to give preferential treatment to women, and should award individual relief to persons injured by operation of the plan between 1994 and 1997.

The district court granted summary judgment in the County's favor, concluding essentially that there is no constitutional violation on this record. Because the district court did not err in making that determination, we affirm.

I.

This case arises out of an affirmative action plan instituted voluntarily by the County in 1984.[1]  The plan was previously the subject of extensive litigation before this Court and the U.S. District Court for the Southern District of Florida.  In 1986, Alan Peightal, an applicant for the position of entry-level firefighter, brought an action against the Department alleging various types of unlawful discrimination pursuant to the County's plan.  In January 1988, the district court, after holding a bench trial, concluded that the affirmative action plan did not violate Title VII or the Equal Protection Clause of the U.S. Constitution.  We affirmed the district court's finding with respect to the Title VII claim, but remanded the Equal Protection claim for reconsideration in light of a then-recent Supreme Court decision, City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S. Ct. 706 (1989).  See Peightal v. Metropolitan Dade County, 940 F.2d 1394 (11th Cir. 1991) (Peightal I).

_____

[1]The following facts are undisputed, unless otherwise noted.

3

Upon return to the district court, the case was reassigned to a different judge. The district court subsequently conducted a second bench trial on January 11, 1993, and concluded that the affirmative action plan satisfied the strict scrutiny test mandated by Croson. 815 F. Supp. 1454 (S.D. Fla. 1993). Although the focus of the trial was race and national origin discrimination, the district court made several findings with respect to the Department's past discrimination against women. Peightal subsequently filed an appeal challenging the district court's Equal Protection and strict scrutiny analysis as it applied to Hispanics; Peightal did not challenge any of the court's findings with respect to African-Americans and women, however. We denied the appeal and affirmed the district court. Peightal v. Metropolitan Dade County, 26 F.3d 1545 (11th Cir. 1994) (Peightal II). Meanwhile, by approximately 1990, the Department had satisfied its hiring goals with respect to blacks and Hispanics. Accordingly, affirmative action hiring of African-Americans and Hispanics was abolished, but the Department continued to give female applicants preferential treatment through a revised affirmative action plan.

With respect to women, this much is clear: The Fire Department discriminated against women by excluding them from firefighting positions until the late 1970s or early 1980s. As a result, in 1983, the Department's workforce

4

was only 1% female while the general population of Dade County was 52% female. The Department was unsuccessful in recruiting women because of its history of discrimination. Accordingly, the County prescribed the preferential hiring of women as part of its voluntary affirmative action plan. The County's ultimate goal, pursuant to the affirmative action plan, was for 36% of the Department's entry-level firefighter hires to be women. That 36% target was based on 1980 census data which showed that the population of Dade County was 52% female; the County took that 52% figure and then reduced it by 30%, in order to take into account the fact that not all women would be interested in becoming, or were qualified to become, firefighters.

The Fire Department's hiring process in 1994-97 had several components. The first step was an initial screening to ensure basic qualifications such as high school diploma, minimum age, and driver's license. Individuals who possessed the requisite basic qualifications were permitted to take a written exam. In 1994, 5807 applicants passed the written test. Due to this large number, the Department conducted a random lottery in order to determine which applicants would advance to the second phase of the selection process. All female applicants who passed the written exam, however, were withdrawn from the lottery and automatically

advanced to the next stage of the selection process. A total of 1050 men and 814 women advanced to the second stage in 1994.

Applicants who were selected to advance to the second phase were required to take a physical ability test ("PAT"). The PAT was rated on a pass/fail basis. Applicants who passed the PAT were then required to submit to an oral interview. Applicants who were successful during the oral interview phase were placed on an eligibility list in rank order. The Department's personnel rules permitted hiring from anywhere on the eligibility list, and hiring out of rank order was permissible. Once the initial eligibility list was exhausted, a second hiring round took place. Individuals who failed any part of round one, including the physical ability test, up to the oral interview stage were called back and retested. After the second round of the hiring process another eligibility list was created.

In 1994, 15.9% of the applicants for the position of entry-level firefighter were female. In 1997, the applicant pool was 21.69% female. As a result of the 1994-97 hiring process, the Department hired 255 candidates, of whom 67 (26.5%) were female; 206 candidates were left on the eligibility list, including 15 females

and 191 males. Subsequent to the 1994-97 recruitment, the Department's workforce had increased from 8.89% female to 11.6% female.[2]

More than sixty males who applied for entry level firefighter positions between 1994 and 1997 filed this case on July 2, 1997, alleging that they suffered discrimination on the basis of sex. There are essentially two groups of plaintiffs. One group includes approximately 50 unsuccessful male applicants whose applications were rejected at the lottery stage. A second group includes 13 unsuccessful male applicants whose applications were rejected at later stages in the process.

The plaintiffs eventually moved for partial summary judgment, seeking a ruling on the overall validity of the affirmative action plan insofar as it favored women. The County responded with a cross-motion for summary judgment in its favor. On July 23, 1999, the district court denied the plaintiffs' motion and granted the County's motion in part. 59 F. Supp. 2d 1252 (S.D. Fla. 1999). Specifically, the court upheld the overall validity of the affirmative action plan, including

---

[2]The Appellants use the figure 13.26% rather than 11.6%, but the former number refers merely to the percentage of women in entry-level firefighter positions, not the percentage of women in the Department overall, by 1997. Focusing on the number of women in entry-level positions only (as opposed to the number of women in the Department as a whole) is incomplete, because the Department's affirmative action remedy was designed to ameliorate the Department-wide effects of its past discrimination against women. In any event, like the district court, we would resolve this case the same way even if we were to use Appellants' figure.

(implicitly) the lottery system, but did not fully resolve the claims of the 13 plaintiffs asserting that testing procedures utilized by the Department at later stages in the hiring process unlawfully facilitated the hiring of less qualified female applicants. On September 30, 1999, the district court denied the plaintiffs' motion for clarification of its earlier ruling, and entered an order of final judgment with respect to the 50 plaintiffs challenging only the overall validity of the plan. Those plaintiffs are the Appellants before us today.[1]

The district court's ruling may be summarized as follows. The court first explained (we think correctly) that this Court's decisions on Peightal I and II did not preclude the plaintiffs from attacking on grounds of changed circumstances the gender-conscious features of the plan. The court then determined that the plan was subject only to intermediate scrutiny under the Equal Protection Clause because gender-based governmental discrimination is reviewed less intensively than race-based discrimination. 59 F. Supp. 2d at 1256. The court then found that the Department's history of past discrimination against women was sufficient to support an affirmative action remedy. Id. at 1256-57. As the court explained, "the record in the instant case and the Peightal line of cases is replete with evidence of

---

[1]The district court did not enter judgment at that time on the claims of the 13 plaintiffs who also challenged the testing procedures. The court eventually entered summary judgment in the County's favor on those claims. Barbera v. Metro Dade County Fire Dept., 117 F. Supp. 2d 1331 (S.D. Fla. 2000). That ruling is not before us today.

8

past discrimination against women." Id. at 1257. The court specifically observed that the Fire Department excluded women from its workforce up until the early 1980s; that as recently as 1983 the Department's workforce was only 1% female while the general population of Dade County was 52% female; that testing and selection procedures utilized by the Department had an adverse impact upon women; and that the Department's efforts to recruit women were unsuccessful in light of its past history of discrimination. See id.

The court rejected Appellants' contention that the Department's reliance upon general population statistics in determining the need for and scope of its plan was erroneous given the possibility of using more refined statistics. Id. ("[G]eneral population statistics may be relied upon to support gender-based relief when bolstered by additional evidence of discrimination."). Nevertheless, the court proceeded to examine the affirmative action plan in light of Appellants' "refined statistics," which Appellants asserted took into account the fact that women were less interested than men in firefighter positions and also were less qualified in that they consistently failed to do as well during the physical ability portion of the hiring process. The district court concluded that even if it "were to find that Plaintiffs' statistical analysis was correct, there was and still is a sufficiently significant disparity between the number of women in the position of entry level

9

firefighter and Plaintiffs' version of the number of women interested and qualified for the position to survive intermediate scrutiny." Id. at 1258. The court reasoned that, at the time that these plaintiffs first suffered discrimination, the Fire Department was still only 8.89% female -- a percentage "clearly well below the number of alleged females capable of and interested in the position of firefighter." Id. Moreover, said the court, by 1997 the percentage of women in the Fire Department's workforce had risen only slightly, to 11-13% female. Id.

The district court rejected Appellants' argument that the Department's goal of 36% female entry-level firefighter hires is unobtainable, and therefore the affirmative action plan is not substantially related to the goal of eradicating discrimination. Id. at 1258. Finally, the court rejected Appellants' suggestion that statistics concerning the number of women currently working in protective services jobs in Dade County demonstrates that the affirmative action plan is no longer necessary or is overly broad. Id. On the basis of these determinations, the district court entered judgment as a matter of law in Defendants' favor.

II.

There is no dispute about the proper standard of review. The district court's summary judgment ruling is reviewed de novo. See Burton v. City of Belle Glade, 178 F.3d 1175, 1186-87 (11th Cir. 1999). Summary judgment is proper only if

10

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only "if the evidence is such that a reasonable [factfinder] could return a verdict" for the non-moving party. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2510, 2511-12 (1986)).

If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). Moreover, when the non-moving party bears the burden of proof on an issue, the moving party need not "support its motion with affidavits or other similar material negating the opponent's claim." Id. at 323, 106 S. Ct. at 2554. Instead, the moving party simply may "'show[]' -- that is[], point out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. (citation omitted). In assessing whether the movant has met its burden, "the courts should view the evidence and all factual inferences therefrom in the light most favorable to the

11

party opposing the motion." Burton, 178 F.3d at 1187. We review the district court's summary judgment order in accordance with these familiar principles.

III.

Appellants contend that the County's preferential treatment of women was not justified as of the 1994-97 period during which Appellants unsuccessfully sought jobs with the Fire Department. Appellants insist that it should have been clear by that point that women are less interested in becoming firefighters, and less physically qualified for the job, than men. Appellants assert that these factors, which they say have nothing to do with the vestiges of past discrimination that the County seeks to eradicate, eliminated the justification for any affirmative action plan favoring women. Appellants therefore ask us to declare that as of 1994, or no later than 1997, the Department had no lawful basis to discriminate in favor of females.

The County responds, among other things, that even under Appellants' "refined" data there is still a significant disparity between men and women in the Department which can only be ascribed to the lingering effects of past discrimination. Specifically, they contend that in 1994, and even in 1997, there remained a sizeable gap between the actual and expected number of women in the Department. The County also emphasizes that it is striving to overcome a long

12

history of illegal discrimination, and that its plan is reviewed continually to ensure that the Department's goals are reasonable.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." The parties agree that, to survive an Equal Protection challenge, a state-sponsored, gender-based affirmative action plan must withstand intermediate scrutiny. See Engineering Contractors Assoc. of South Fla., Inc. v. Metropolitan Dade County, 122 F.3d 895, 908 (11th Cir. 1997); see also Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S. Ct. 3331, 3335 (1982) (applying intermediate scrutiny to gender-based classification).[2] Under intermediate scrutiny, "a gender preference may be upheld so long as it is substantially related to an important governmental objective." Engineering Contractors, 122 F.3d at 908. In Engineering Contractors, we explained how that inquiry proceeds:

> In attempting to satisfy the important governmental objective prong of the intermediate scrutiny test, . . . the objective of . . . "'redress[ing] discrimination against women[]'" . . . is unquestionably a sufficiently "important" one to sustain a gender-conscious affirmative action program. Therefore, as in the racial analogue, "the

_____

[2]Although Appellants reference the standard for determining whether an affirmative action plan violates Title VII, see Johnson v. Transportation Agency, 408 U.S. 616, 630-40, 107 S. Ct. 1442, 1451-56 (1987), they focus their argument on Equal Protection. Appellants do not argue that even if they lose on Equal Protection, they may still prevail under Title VII, or vice versa. Accordingly, in this opinion we concentrate on Equal Protection analysis.

true test of an affirmative action program is usually not the nature of the government's interest, but rather the adequacy of the evidence of discrimination offered to show that interest."

Although it is clear that both gender-conscious and race- or ethnicity-conscious programs must be tested for evidentiary sufficiency, . . . a gender-conscious affirmative action program can rest safely on something less than the "strong basis in evidence" required to bear the weight of a race- or ethnicity-conscious program. . . . [I]n the gender context less evidence is required. . . . [A] proponent of a gender-conscious affirmative action program must present not only probative evidence of discrimination, but sufficient probative evidence of it. . . . Although the difference between the "strong basis in evidence" standard applicable to race- or ethnicity-conscious programs and the less stringent "sufficient probative evidence" standard applicable to gender-conscious programs cannot be measured or described with scientific precision, we have previously recognized two principal guidelines that mark the boundaries of intermediate scrutiny evidentiary analysis.

First, "[u]nder the intermediate scrutiny test, a local government must demonstrate some past discrimination against women, but not necessarily discrimination by the government itself." Second, the intermediate scrutiny evidentiary review is not to be directed toward mandating that gender-conscious affirmative action is used only as a "last resort," but instead to ensuring that the affirmative action program is "a product of analysis rather than a stereotyped reaction based on habit." Nevertheless, any "'analysis' that rests upon unsupported factual premises cannot possibly be 'reasoned,' and an untrue and widely-held generalization about men or women is by definition a 'stereotype.'" That is why the intermediate scrutiny evidentiary "inquiry turns on whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed." Unsupported generalizations will not suffice.

Although sufficiency-of-the-evidence standards may elude precise formulation, we believe the foregoing two guidelines will

14

assist courts in determining when a government has presented sufficient probative evidence in support of its stated rationale for enacting a gender preference, i.e., when the evidence is sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations.

Id. at 908-11 (emphasis added) (citations omitted).

Appellants do not dispute that redressing past discrimination against women is an important governmental interest supporting the existence of a gender-conscious affirmative action plan. Nor do Appellants take issue with the sufficiency of the original evidentiary basis for the County's affirmative action plan. Rather, they contend that there was an insufficient basis for the plan, and the Department's preferential treatment of women, during the 1994-97 period.

The specific focus of their objection is the Department's 36% "long-term" goal for female representation. This argument rests primarily on the belief that using general population figures from 1980 to determine the "appropriate" number of women who should be holding Fire Department jobs today is flawed both legally and factually when more refined data is available. Appellants contend that we now know -- as we did not in 1984 -- that general population figures are misleading because they do not take into account that women are inherently not as interested in being firefighters, and are inherently less capable of meeting the physical ability requirements necessary to be firefighters, than men. Accordingly,

15

Appellants say, the plan's long-term goal of 36% women -- which is based upon general population data -- is fundamentally flawed.[3]

It certainly is true that this Court has indicated that a government affirmative action plan should not be based on general population figures where there exists more refined data establishing the proper labor pool. In his concurring and dissenting opinion in Peightal I, Judge Tjoflat suggested that the County's plan did not comport with Title VII in part because "the district court used a flawed methodology to conclude that there is a manifest imbalance between the percentage of minorities employed by appellee and the percentage of minorities in the relevant labor pool." 940 F.2d at 1411. As Judge Tjoflat explained: "[The] district court . . . simply looked at the percentages of minorities of Dade County, and compared that with the percentages of minorities employed as firefighters in the Department, to decide whether the disparities justified an affirmative action program. [But w]here evidence exists 'showing that the figures for the general population might not accurately reflect the pool of qualified job applicants,' the value of such figures

---

[3]Technically speaking, the 36% goal is not entirely a function of general population data, because it represents a 30% reduction in the percentage of women in the population at large (52%). This reduction is intended, at least in part, to take account of the fact that not all women are interested or physically qualified to be firefighters. Appellants believe that this 30% reduction is arbitrary and, unlike their refined data, does not take sufficient account of the foregoing limitations on the size of relevant labor pool.

16

for evaluating the legality of an affirmative action plan is greatly diminished." Id. at 1411-12 (quoting International Bd. of Teamsters v. United States, 431 U.S. 324, 339 n.20 (1977)).

Judge Tjoflat reasoned that, when there is an indication that general population figures may not accurately reflect the qualified labor pool, a governmental body instituting an affirmative action plan -- and a court reviewing such a plan -- "should search for figures that more closely approximate the qualified applicant pool," instead of starting from the assumption that racial or gender composition of the population as a whole reflects the racial or gender composition of the qualified labor pool. 940 F.2d at 1412 (citing Wards Cove Packing Co. v. Antonio, 490 U.S. 642, 650, 109 S. Ct. 2115, 2121 (1989)). In Peightal II, we endorsed Judge Tjoflat's concerns, and noted again the "relative undesirability of general population figures." 26 F.3d at 1554.

Appellants' refined data only takes them so far, however. Simply presenting such data does not entitle an aggrieved party to relief; rather, the data must be sufficiently developed to demonstrate that the challenged plan is unlawful. In Peightal II, for example, we ultimately concluded that the County's plan survived strict scrutiny insofar as it discriminated against whites because the plaintiffs "fail[ed] to adduce more refined statistical data." Id. at 1555.

17

As discussed below, we share some of Appellants' concerns about the County's plan and in particular the 36% long-term female hiring goal. The problem, however, is that this record does not contain sufficiently developed evidence to entitle Appellants to any relief in this case. Specifically, even if we were to accept Appellants' refined applicant flow data, the evidence does not show that the County's affirmative action plan (including the lottery system) was unjustified with respect to women as of 1994-97. Moreover, although Appellants' evidence does suggest that the 36% goal may be too high, there is no evidence establishing that Appellants' applications would have been treated any differently if that figure had been in the 15.9%-21.69% range arguably suggested by their data. For these reasons, we cannot find a constitutional violation on this record.

Regarding the threshold question whether the County had sufficient justification for giving any preferential treatment to women applicants in 1994-97 through its affirmative action plan, the evidence falls well short of proving that this preferential treatment was impermissible. As the district court observed, there is substantial evidence of the Fire Department's systematic discrimination against women for many years prior to the adoption of the affirmative action plan in 1984. See Ensley Branch, NAACP v. Seibels, 31 F.3d 1548, 1581 (11th Cir. 1994) ("In a case [where] there is no allegation that gender-based affirmative action was

18

adopted because of 'archaic and overbroad assumptions about the relative needs and capacities of the sexes,' the 'important government interest' inquiry turns on whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed.") (internal citation omitted). As of 1983, when the affirmative action program began, the Fire Department's workforce was only 1% female; only eight years before, the Department had no females. The district court, in a decision we affirmed in Peightal II, found specifically that the Department's practices had a disparate effect on women and therefore the County had "a compelling interest in instituting an affirmative action plan to remedy past discrimination . . . against women . . . ." 815 F. Supp. at 1466. The court found that one of the long-term goals of the affirmative action plan was to "relieve the underrepresentation of . . . women in the Fire Department." Id. at 1458. And it found that even extensive recruitment efforts "would not be sufficient to solve the problem of underrepresentation of women." Id.

The data for the 1994-97 period shows that women remained substantially under-represented in the Department. At the start of the period, just 8.89% of the Department's firefighters were female. By the end of that period, the percentage of females was still only 11.6%.

Appellants argue that this under-representation of females was not due (at least by 1994) to any lingering effects of past discrimination. Instead, they say, it was due to females' lack of interest in becoming firefighters. This fact is critical, according to Appellants, because it demonstrates why the County's reliance on general population data is flawed, and also demonstrates why their refined data -- which purports to take account of this lack-of-interest factor -- is more reliable. Appellants observe that the percentage of female applicants during the relevant period ranged from only 15.9% (1994) to 21.69% (1997), and contend therefore that a figure between 15.9%-21.69% -- not the 36% figure derived by the County from general population data -- is the proper figure to be compared to the number of women in the Department's workforce and used in determining whether affirmative action was justified.

The central problem with Appellants' claim is that their data, even if credited, does not establish that the Department's preferential treatment of women pursuant to its affirmative action plan was unjustified by 1994-97. We have in the past emphasized the need for courts to examine whether gender-conscious affirmative action plans take sufficient account of the possibility that females may not be interested in the relevant position. See United States v. City of Miami, 2 F.3d 1497, 1507-08 (11th Cir. 1993). But even using Appellants' data, there

20

remains a significant gap between the percentage of women in the Department by 1997 (11.6%) and Appellants' highly imprecise estimate of what that percentage should have been taking account of females' asserted lack of interest in becoming firefighters (15.9%-21.69%).[4]

Appellants also argue that the County's use of general population figures fails to take account of the fact that women are less physically qualified than men to be firefighters. Appellants maintain, and the County does not dispute, that to be qualified as a firefighter an applicant, male or female, must meet certain basic physical fitness standards. Those standards are gauged in a test administered by the County as part of the hiring process; if an applicant fails on the first round, he or she may take the test again. Appellants observe that, in 1994, 97.2% of the eligible male applicants passed the physical ability exam on the first round, while only 11.8% of the female applicants passed on the first round. During the second, "try again" round, 98.6% of the men passed, while only 39.2% of the women

---

[4]The premise of Appellants' argument is also questionable. Appellants' contend that their applicant flow data takes account of the fact that women are less interested in becoming firefighters than men. But the fact that the female applicant numbers rose dramatically from 1994 to 1997 -- from 15.9% to 21.69%, or in raw numbers, 1180 to 1469 -- suggests that as more women become aware of the Department's outreach efforts and newfound receptiveness to female applicants, more women are ready to apply. At the very least, this evidence may show that a 15.9%-21.69% figure underestimates the real number of women interested in becoming firefighters.

21

passed.  Citing these figures, Appellants contend that women are simply not as physically qualified as men to be firefighters.

Physical characteristics may impact the size of the qualified applicant pool. See City of Miami, 2 F.3d at 1507-08.  But Appellants' physical ability data does not establish that the affirmative action plan was unjustified in 1994-97.  In particular, Appellants completely fail to relate their physical ability data to other data concerning females' interest in or qualifications for the position.  Indeed, Appellants do not show, or even argue, that data relating to the performance of women on the physical ability exam alters the 15.9%-21.69% figure (based on females' asserted lack-of-interest) which they say more accurately reflects the "appropriate" number of women in the Department.[5]  As stated above, the difference between that figure and the actual number of women in the Department during the relevant period is significant, and sufficient to support affirmative action under intermediate scrutiny analysis.

_____

[5]Appellants do not contend that no women are physically qualified to be firefighters, or that only a tiny percentage of women are physically qualified.  Indeed, Appellants never state specifically the percentage of women that they believe are physically qualified.  When asked at deposition whether he had any data indicating the percentage of women he felt were qualified to be firefighters, Appellants' own statistical expert, Dr. White, answered no.  To reiterate, although data showing that women are less physically able than men to serve as firefighters may well be relevant in determining the qualified applicant pool, Appellants' data is insufficient on this record.

Ultimately, therefore, the data marshaled by the Appellants, even if fully credited, does not establish that the Department's preferential treatment of women pursuant to its affirmative action plan was unjustified by 1994-97. Even using Appellants' data, there remained a significant gap between the percentage of women in the Department by 1997 (11.6%) and Appellants' highly imprecise and incomplete estimate of what that percentage should have been (15.9%-21.69%). That gap is sufficient under intermediate scrutiny to justify the County's affirmative action plan.

Appellants do not dispute that this gap is significant, but instead offer two rejoinders. First, they try to apply an additional 30% reduction to their estimate, supposedly to mirror the County's 30% reduction to the percentage of women in the population at large (52%) to arrive at the plan's long-term goal of 36%. See note 3, supra. As Appellants' own expert conceded, however, there is simply no foundation for applying such a reduction to Appellants' estimate. Among other things, the County's 30% reduction was intended to take account of the fact that some females lack interest in or qualifications for the job; Appellants' refined data purports to incorporate that fact in a more precise way, so there is no basis for applying an additional 30% reduction to their data.

Second, Appellants contend that the disparity between the low end of their estimate of the percentage of women who should have been in the Department (15.9%), and the actual representation of women, in 1997 is statistically insignificant. Cf. Peightal II, 26 F.3d at 1556 n.16 (suggesting that a disparity is statistically significant in this context when it represents more than two or three standard deviations) (citing Waisome v. Port Authority, 948 F.2d 1370, 1376 (2d Cir. 1991)). Appellants, however, offer no persuasive support for this argument. Appellants' calculation incorrectly focuses only on the number of women in entry-level firefighter positions in 1997 as opposed to the Department as a whole. See note 2, supra. Appellants also establish no legal or statistical foundation whatsoever for comparing the number of women in entry-level firefighter positions in 1997 to the number of applicants for such positions in 1994 (the basis for Appellants' low end figure).[6] For all of these reasons, we find on this record that the County's use of affirmative action in 1994-97 was justified.

The analysis does not necessarily end there, of course. One could still argue, as Appellants basically do, that the plan -- even if justifiable to some degree -- is

---

[6]Notably, Appellants' expert conceded that there is a "highly significant" statistical difference between the actual number of women in entry-level firefighter positions in 1997 and the number of applicants for such positions in 1997. He made the same concession regarding 1994.

24

still unlawful to the extent it is pegged to an unrealistically high hiring goal of 36%.[7] Appellants' data, although it does not establish that the County's use of affirmative action by 1994-97 was unjustified, does suggest that a specific 36% hiring goal is too high. And far from disputing that allegation that 36% is too high a target, the County all but <u>concedes</u> that the 36% goal is unobtainable. At oral argument counsel for the County described the goal as "probably unrealistic," and in its brief the County simply responds "[p]erhaps not" to Appellants' assertion that the 36% goal may not be fulfilled even 15-20 years from now.

The County responds, however, by stressing that the 36% figure is a "long-term" hiring goal that bears no relationship to how the plan is implemented on an annual basis. It is undisputed that the Department based its annual hiring practices on a lower goal, in the neighborhood of 25%. Between 1994 and 1997, it appears that only 26% of the Department's entry-level firefighter hires were women, and during this period the Department actually declined to hire some of the women on

---

[7]Appellants object to the County's continued use of population figures from 1980 in lieu of more recent data. The County responds that the percentage of females in the available labor pool did not change between 1980 and 1990 (the date of the last census before the 1994-97 hiring period). There is no evidence in the record to establish the illegality of the Department's plan solely on the basis of the County's use of obsolete population data. We are confident that the County -- to the extent it continues to apply its affirmative action plan -- will also take into account more recent population data. We also reject Appellants' argument that data regarding the percentage of women in protective services positions in Miami-Dade County demonstrates the illegality of the Fire Department's plan.

25

the final eligibility list even though it could have done so. The County also insists that it does not view the 36% target as a permanent, inflexible number; rather, says the County, it reviews that figure annually in light of the data available to it, and may adjust that figure up or down as circumstances require.

On this limited record and at this time, we agree that as of 1994-97 there was enough of a fit between the County's plan and its asserted justification of eradicating the Fire Department's past discrimination against women to satisfy intermediate scrutiny. The evidence is sufficient, in these circumstances, to support the conclusion as a matter of law that the plan as it actually was applied is "substantially related" to the goal of redressing the effects of prior unlawful discrimination. See Ensley, 31 F.3d at 1581-82; see also Engineering Contractors, 122 F.3d at 929 ("under intermediate scrutiny, a gender-conscious program need not closely tie its numerical goals to the proportion of qualified women in the market"); Eldredge v. Carpenters 46 No. Calif. Counties Joint Apprenticeship and Train. Comm., 94 F.3d 1366, 1371-72 (9th Cir. 1994) (same). The 36% target is not applied as a rigid quota, and indeed, does not appear to be used at all in implementing the plan from year-to-year.

Just as critically, there has been no showing that the 36% target, even if unsustainably high, caused the Appellants any injury. Appellants concentrate their

26

attack on the 36% goal, but in so doing fail to demonstrate -- except at the highest order of abstraction -- how that figure actually affected them. Appellants present no evidence tying the 36% figure to the number of male applicants surviving the lottery system. There is no showing that the treatment of Appellants' applications at the lottery stage would have been any different if the hiring target had been set at a lower percentage (for example, the 15.9%-21.69% figure arguably suggested by Appellants' refined data). The County has represented that the 36% figure bears no connection with the percentage of males surviving the lottery, and Appellants have come forward with no evidence disputing that representation. Accordingly, even accepting Appellants' argument that the 36% figure is too high, that fact would not entitle them to any relief on this record. Although the goals of the County's plan and some of the data underlying those goals may be questionable in some respects, we are applying only intermediate scrutiny, and under that standard, we find the plan justified for the 1994-97 period. The district court did not err by entering summary judgment against the Appellants.

All that said, we find the County's response to these issues troublesome. Although the County asserts that the 36% goal is flexible, there is no evidence that it has ever altered that goal -- even once -- in the 17 years that the plan has been in operation. Notwithstanding the County's insistence that the 36% "long-term"

27

target does not dictate what actually happens on an annual basis, it seems clear that the 36% goal is being used to justify perpetuation of the affirmative action plan. It is undisputed that not once in the long life of the plan has the Department hired anywhere near 36% women for entry-level firefighter positions. Making matters worse, during the 1994-97 period, the Department knowingly declined to hire women it had already deemed qualified and placed on its eligibility list. The practical effect of maintaining a "long-term" hiring goal of 36% females, without ever hiring that percentage in any given year, is to make the plan exist in perpetuity, long after any effects of past discrimination have been eradicated. Needless to say, the Department will never achieve its 36% target if it hires no more than 26% women per year.

An affirmative action plan may not go on forever. See, e.g., Ensley, 31 F.3d at 1570 ("The goal of eliminating discrimination may justify some interim use of affirmative action, but affirmative action selection provisions are themselves a form of discrimination that cannot continue forever."). Simply because discrimination in the form of affirmative action may be lawful at one point in time does not mean that such discrimination may be countenanced in the future. In City of Miami, for example, we expressed concern over a municipal fire department's argument that its long-term goal of work force parity had not yet been achieved,

28

because if that "were the sole determining factor, the consent decree would likely remain in force indefinitely given the Department's lack of success in recruiting women." 2 F.3d at 1508 n.36. We stressed that "when, for reasons unrelated to past discrimination or to the fault of the parties, goals unnecessary to the achievement of the basic purposes of the [an affirmative action plan] will either never be met or will be met only with great difficulty," the plan may not withstand scrutiny. 2 F.3d at 1508.

In Ensley, this Court was even more explicit in discussing why components of an affirmative action plan may not create a regime where "gender-based appointments would likely continue forever."

> It was an abuse of discretion for the district court to permit such a potentially indefinite cycle of discrimination to continue. Perpetual use of affirmative action may foster the misguided belief that women cannot compete on their own. That notion is just "as pernicious and offensive as its converse, that women ought to be excluded from all enterprises because their place is in the home." When affirmative action outlives the pressing necessity that justifies its use, it begins to breed the very "archaic and overbroad assumptions about the relative needs and capacities of the sexes" that it was designed to erase.

31 F.3d at 1581-82 (citations omitted).

The Department has now been granting preferential treatment to female applicants for nearly two decades. When government voluntarily adopts an affirmative action plan to remedy the effects of its past discrimination, it must

29

pursue its goals "with a sense of urgency." Id. at 1571. This is so not only because the duration of the plan is a key factor in assessing its validity, see, e.g., Engineering Contractors, 122 F.3d at 927; Peightal II, 26 F.3d at 1559, but also because a governmental body which is prepared to admit to a history of discrimination should feel compelled to remedy its misconduct swiftly. Notably, during oral argument in this case, the County agreed that it could move faster to achieve its female hiring goals. Indeed, the County agreed that it could eliminate its plan entirely within three-to-four years.

Although we do not decide today, based on the parties and record before us, that the plan was unlawful in 1994-97, there are serious questions about the ongoing validity of the plan. And we have little doubt that there is an ample supply of unsuccessful male applicants for entry-level firefighter positions with the County who may fairly bring similar challenges in the future. For these reasons, the County should evaluate closely its female hiring goals, both short-term and long-term, and proceed "with a sense of urgency" to accomplish fully whatever goals it believes are appropriate and legally permissible in light of the relevant facts and circumstances as they exist today. If, as the County has represented to us, it properly can eliminate its plan entirely within three or four years, it must proceed

30

to do so.  As for the particular Plaintiffs now before us, however, on this record we affirm the entry of summary judgment in Defendants' favor.

**AFFIRMED.**

HAND, District Judge, specially concurring:

The opinion of the writing judge in this case is a masterpiece of judicial logic that clearly and cogently delineates the problems with the obligatory law as it now stands on issues such as are raised in this case, and one with which I am happy to concur.  I write separately only for the purpose of expressing my continuing consternation with our "modern day" legalistic approach to the solutions of problems of the nature of those involved in this litigation.  We have developed an overweening desire in our approach to societal issues to try to make all things perfect through the use of  law, be it legislative, bureaucratic or judicial.  We allow ourselves to be engaged in social engineering which is, at best, not an exact science and rarely succeeds, if ever, in solving its honest intents.

History clearly demonstrates that in any free society all that any citizen can rightfully expect from the law is that it  provide to any who are confronted with it that they will have equal opportunity to or for justice.  Anything more than that involves rank meddling by the government and/or the judiciary and carries with it all of the ramifications which history has shown result from such micro management of life, the chief result of which is the loss of individual freedom so clearly and jealously regarded by the founders of our government.  During the course of oral argument in this case the County, through its counsel, admitted that

they no longer discriminate in any fashion against women and have not done so for many years.   If this is indeed the case it is axiomatic that the government's continued actions under the rubric of some claim of necessity is unjustified and constitutes a classic example of the government placing the finger of the law on one side of the scale of justice to reach a perceived balance no longer justified. This is inimical to a free society and will ultimately be the product cause of its undoing.